**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| 5-STAR GENERAL STORE aka BENTO LLC, MARC ALLEN, INC., FAST FORWARD MEDIA, INC., MEZE LLC, KENNEDY'S IRISH PUB INC., CARDEN, INC., FRENCH FLORIST, LLC, LUXE FURNITURE, INC., LUNA'S HOSPITALITY GROUP, LLC, and THE GENT'S PLACE MEN'S FINE GROOMING LLC, on behalf of themselves and others similarly situated, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES CO. INC., | |
| Defendants. | |

This action seeks injunctive and declaratory relief against American Express on behalf of a class consisting of 5,155 merchants as to whom Amex has waived the right to compel arbitration.

## INTRODUCTION

1.     U.S. merchants have long sought to constrain the swipe fees that the major payment-card networks impose on merchants each time a card is used at their business. Typically, for small merchants in the United States today, swipe fees amount to 3% or more of each credit-card sale. The toll is heaviest on small businesses with tight margins, such as grocery stores, local retailers, and restaurants. For many of these merchants, credit-card swipe fees eat up roughly half of what the small business owner can take home at the end of the month. And even for businesses with higher margins, runaway swipe fees are a serious burden, driving up the prices that retailers

1

must pass along to their customers.

2.      Swipe fees vary a great deal based on card type, size of merchant, and other variables.  Debit cards, for example, cost most merchants less than half of what Amex cards do; Discover cards have historically been much cheaper than Amex as well.  As a result, U.S. merchants have long sought the right to influence their customers' decisions regarding which payment card product to use, including the right to offer shoppers inducements to use cards that carry lower swipe fees.  Until the 2010s, each of the three giant credit card networks—Visa, Mastercard, and Amex—maintained rules banning merchants from trying to steer customers to cheaper card products.  The networks' rules, for example, barred merchants from offering a discount to customers for using a cheaper payment product, or from assessing a small fee (or surcharge) for using more expensive cards, or even from simply asking customers to please use a cheaper credit card.

3.      Since that time, litigation efforts by merchants and the U.S. Department of Justice have fostered important reforms.  By the end of 2013, both Visa and Mastercard had fully dropped their bans on steering and surcharging in response to merchant class-action litigation and DOJ antitrust enforcement.  And in the years that followed, courts around the country struck down state statutes that limited the ability of merchants to use credit-card surcharging to control their acceptance costs.

4.      Now, in the wake of these reforms, it is Amex's rules alone that prohibit U.S. merchants from using discounts, surcharges, verbal prompting, signage, and other techniques to incentivize shoppers to use cheaper payment cards.  Amex's rules against all these forms of steering—which Amex refers to as its non-discrimination provisions, or NDPs—restrain competition across the marketplace, on all brands.  The rules of Visa, Mastercard and Discover

now *permit* merchants to offer a discount for using a competitor's cheaper card product, or to post signage indicating a payment-brand preference, or to reveal to shoppers the swipe fees the merchant incurs on the various credit card brands. But a merchant that accepts all major cards cannot do any of those things without violating Amex's NDPs.

5.      In a competitive market, a firm that lowers its price will increase its sales volume, all else being equal. With the NDPs in place, however, a card network that offers merchants cheaper swipe fees than its competitors will not gain any transaction volume, even if it offers the same exact rewards to cardholders as its rivals do. Thus, Discover's CEO complained in sworn testimony that – because of anti-steering rules – "lowering your price" as a credit card network "does not drive incremental sales." Similarly, Amex's own head of merchant pricing has testified that, in the U.S. card market, "no one's business strategy is to be cheaper than the next guy." And the sole reason why ordinary price competition does not work in the U.S. card market is Amex's NDPs. Were it not for the NDPs, card networks would compete with one another on the prices they offer both merchants and cardholders.

6.      Not only do the NDPs thwart price competition among credit-card networks, but they absolutely foreclose important dimensions of competition among merchants. Merchants compete every day with one another on such dimensions as whether and how much to charge for shipping, or for parking, or wi-fi or any number of other services. These are important avenues of horizontal, inter-brand competition between merchants. Merchants would likewise compete with one another on the dimension of whether and how much to charge for card acceptance service. But the NDPs flatly foreclose any such competition.

7.      To date, merchants have been unable to use antitrust litigation to reform Amex's rules because of binding arbitration requirements that Amex imposes upon all U.S. merchants.

These arbitration provisions prohibit any form of collective action inside the arbitral forum. *See American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013) (upholding, in antitrust litigation by merchants, Amex's clause requiring one-on-one arbitration of any dispute); *In re American Express Anti-Steering Rules Litig.*, 433 F. Supp. 3d 395 (E.D.N.Y. 2020) (compelling arbitration of merchant challenges to Amex's NDPs).

8.      Still, merchants continue to challenge the NDPs.  By the end of July 2023, thousands of merchants all over the country had filed individual arbitration demands against Amex in the American Arbitration Association, or AAA.  Some 5,155 of those claims sought injunctive relief as well as damages and were filed by merchants that Amex recognizes as active accounts, such that they have standing to seek injunctive relief.  Other claims, outside of the 5,155, were filed for damages only by merchants who are inactive, and thus ineligible to seek injunctive relief.  Still others were filed by merchants whose identity as an Amex-accepting merchant is unclear or contested by Amex.

9.      All merchant arbitrations filed in AAA against Amex are governed by the AAA Commercial Rules and its associated filing fee schedule.  Under that schedule, any claim seeking "non-monetary relief" is subject to an initial filing fee of at least $3,500.  Of this, the merchant must pay only the amount it would have been charged as a filing fee in court, pursuant to the applicable Amex arbitration clause.  Amex is responsible for all other filing, administrative, and arbitrators' fees.  Thus, for each of the 5,155 claims seeking injunctive relief, the merchant must pay $350 in initial filing fees (representing the judicial filing fee that AAA found would be applicable in New York) and Amex must pay $3,150 in initial filing fees.

10.      In January 2024, AAA issued invoices for the 5,155 merchant claimants that seek both injunctive and monetary relief.  As amended to correct a clerical error, the invoices call for

Amex to pay $16,238,250 (i.e., 5,155 x $3,150) and for claimants to pay $1,804,250 (i.e., 5,155 x $350). The due date for payment was February 26, 2024.

11. From the outset, Amex took the position that it would not pay the invoice. First, Amex counsel complained that the invoice amount was at variance with what they had been led to expect in earlier *ex parte* telephone conversations with AAA administrators. Next, Amex disagreed with the AAA's determination that these claims implicate non-monetary relief within the meaning of the AAA fee schedule, contending that Amex would stipulate to allow narrow merchant-specific injunctions, once liability is proven. And Amex disagreed with the AAA's determination that claimants had satisfied their initial filing requirements under the AAA rules, arguing that claimants had failed to provide sufficient evidence of the "existence" of arbitration agreements between claimants and Amex.

12. Standing its ground, the AAA rejected Amex's challenges to the AAA's interpretation of its own rules. On February 22, 2024, AAA Vice President and Counsel Elizabeth Corsetti wrote the parties, reiterating the AAA's determination that "Claimants' minimum filing requirements have been met," obligating Amex to pay the invoiced amount:

> We understand it is Respondents' position that they are not obligated to pay the AAA filing fees assessed for the 5,155 damages and injunctive relief claims. These filing fees remain due to the AAA by **February 26, 2024,** pursuant to the AAA's initial determination as referenced above. If payment for the 5,155 cases is not received by February 26, 2024, the cases will be administratively closed. (Emphasis in original).

13. The claimants timely paid their invoice for the 5,155 claims. American Express refused to pay its invoice for the 5,155 claims. Amex did, however, pay the filing fees attributable to the damages-only claims, as did the claimants' counsel.

14.     On February 29, 2024, Ms. Corsetti again wrote the parties, confirming that the damages-only cases were paid up and ready to proceed.  "As to the remaining 5,155 claims," she continued, "in accordance with our previous correspondence, because we did not receive payment by the previously communicated deadline, these cases are administratively closed for non-payment."  Subsequently, in a March 4, 2024 videoconference, the AAA administrators reiterated that the closure of the 5,155 cases is final.

15.     Under Section 3 of the Federal Arbitration Act, a party may not seek to compel arbitration of a claim when that party is "in default in proceeding with such arbitration."  9 U.S.C. § 3.  Here, Amex is in default in proceeding with the arbitration of the 5,155 claims.  Separately, by its actions, Amex has waived the right to compel arbitration of those claims under ordinary common law waiver principles.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because this action seeks, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This Court further has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because there exists at least minimal diversity among the parties and the amount in controversy exceeds $5 million.

17.     This Court has personal jurisdiction over the defendants because, among other things, they actively promote Amex-branded card acceptance services to merchants in Rhode Island and have executed agreements containing the challenged NDPs with merchants located in Rhode Island.

18.     Venue is proper in this district under 15 U.S.C. § 22, because the Defendants may be found or transact business within this district, and under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims of representative plaintiffs 5-Star General Store, Marc Allen Inc. and Fast Forward Media occurred in this district.  Moreover, the acts and omissions relating to Amex's waiver of its right to compel arbitration substantially occurred in this district, at the AAA Northeast Case Management Center in Johnston, Rhode Island, where Ms. Corsetti and other AAA administrators are located.

## THE PARTIES

19.     Plaintiff 5-Star General Store aka Bento Enterprises LLC is a limited liability company organized under Rhode Island law with its principal place of business in Rhode Island. Bento Enterprises LLC owns and operates 5 Star General Store & Deli on Main Street in Pawtucket, Rhode Island, where it accepts all major payment cards including American Express.

20.     Plaintiff Marc Allen Inc. is a corporation organized under Rhode Island law with its principal place of business in Rhode Island.  Plaintiff Marc Allen Inc. owns and operates Marc Allen, a fine clothier offering custom tailored and ready to wear menswear.  Marc Allen is located in Providence, Rhode Island, where it accepts all major payment cards including American Express.

21.     Plaintiff Fast Forward Media, Inc. is a corporation organized under Rhode Island law with its principal place of business in Rhode Island.  Plaintiff Fast Forward Media, Inc. owns and operates Fast Forward Media, which offers video production, photography, studio rental and other services.  Fast Forward Media is located in Providence, Rhode Island and it accepts all major payment cards including American Express.

22.     Plaintiff Meze LLC is a limited liability company organized under Massachusetts law with its principal place of business in Worcester, Massachusetts.  Meze LLC owns Meze Estiorario, a Greek restaurant located on Shrewsbury Street in Worcester which is operated by Panos and Sam Georgiadis.  Meze Estiorario accepts all major payment cards including American Express cards.

23.     Plaintiff Kennedy's Irish Pub Inc. is a Massachusetts corporation with its principal place of business in Massachusetts.  Kennedy's Irish Pub Inc. owns Kennedy's Restaurant, which is operated by Michael Kennedy and his family in Marlborough, Massachusetts as part of Kennedy's Restaurant & Market, a longstanding Marlborough landmark.  Kennedy's Restaurant accepts all major payment cards including American Express cards.

24.     Plaintiff Carden Inc. is a Massachusetts corporation with its principal place of business in Massachusetts.  Carden Inc. owns Kennedy's Market, which is also operated by Michael Kennedy and his family in Marlborough, Massachusetts as part of Kennedy's Restaurant & Market. Kennedy's Market accepts all major payment cards including American Express cards.

25.     Plaintiff French Florist LLC is a limited liability company organized under California law with its principal place of business in Los Angeles, California.  French Florist LLC owns and operates French Florist, a premier Los Angeles florist with multiple locations and an online business at frenchflorist.com.  At all its locations and in its online business, French Florist accepts all major payment cards including American Express cards.

26.     Plaintiff Luxe Furniture Inc. is a Florida corporation with its principal place of business in West Palm Beach, Florida.  Plaintiff Luxe Furniture Inc. owns and operates the Luxe Furniture retail business including the website luxefurniture.net.  Luxe Furniture accepts all major payment cards including American Express cards.

27.     Plaintiff Luna's Hospitality Group LLC is a limited liability company organized under Texas law with its principal place of business in The Woodlands, Texas.  Plaintiff Luna's Hospitality Group LLC owns and operates Uli's Kitchen, a restaurant specializing in the cuisine of Veracruz, Mexico.  Uli's Kitchen is located in The Woodlands, Texas, and it accepts all major payment cards including American Express.

28.     Plaintiff The Gent's Place Men's Fine Grooming LLC is a limited liability company organized under Texas law with its principal place of business in Frisco, Texas.  The Gent's Place Men's Fine Grooming LLC owns and operates The Gent's Place, a membership-based men's haircare, grooming and spa services business.  The Gent's Place is located in Frisco, Texas and accepts all major payment cards, including American Express.

29.     Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

30.     Defendant American Express Travel Related Services Company, Inc. is a New York corporation, with its principal place of business in New York, New York, and is a wholly-owned subsidiary of American Express Company. American Express Travel Related Services Company, Inc. is generally responsible for all aspects of the payment card business conducted under the American Express brand, including the operation of the American Express network.

## FACTUAL BACKGROUND

**Amex's Non-Discrimination Provisions, or NPDs**

31.     The plaintiffs and all other Amex-accepting merchants in the U.S. are obligated to follow Amex's non-discrimination provisions, which are set forth in § 3.2 of American Express's Merchant Operating Guide ("MOG"), available on American Express's website. The NDPs are incorporated by reference or substantially mirrored in Amex's card acceptance agreements with

U.S. merchants, and Amex requires that third-party processors who offer Amex card acceptance to merchants must contractually obligate each merchant to follow the NDPs. *See also* MOG at § 1.2 (the MOG "sets forth the policies and procedures governing your acceptance of the American Express® Card. It is a part of, and is hereby incorporated by reference into, the Merchant Agreement with your Merchant Services Provider").

32.    Under Amex's NDPs, the merchant:

a.    may not state a preference for any other credit card or type of card – e.g., the merchant may not say verbally or via signage that "we prefer Discover" or "we prefer debit cards" or "help us keep prices down, please use debit if you can";

b.    may not reveal to its customers the cost it incurs to accept transactions on Amex and other networks, including debit, even if the information is accurate and truthful;

c.    may not offer the customer a discount in exchange for using a competing credit card, such as Discover;

d.    may not impose a "differential surcharge" on Amex transactions, meaning a surcharge in which at least one other credit card brand is surcharged at a lower amount than Amex or not at all; and

e.    may not impose a "parity surcharge" on credit card transactions, meaning a surcharge in which the merchant assesses the same surcharge amount on all credit card brands and does not surcharge debit cards at all.

33.    Amex's NDPs govern card acceptance on all brands across the entire U.S. marketplace. Amex has gone from being accepted at 60% or so of all credit-card accepting merchants in 2013 to 99% today. Thus, because of the NDPs, some 99% of merchants that accept credit cards in the U.S. today are unable to offer a discount for using a credit card that has lower

swipe fees, or to steer in favor of such cards verbally or via signage, or to disclose their acceptance costs to customers.  Thus, even though Mastercard rules permit steering, a merchant cannot use verbal prompting or signage to steer a Mastercard holder to use debit because that practice would violate Amex's NDPs.  Nor can the merchant offer discounts to induce a Visa cardholder to use Discover because that practice would violate Amex's NDPs.  In sum, it makes no difference what Visa, Mastercard or Discover rules may permit.  Amex's ban on steering controls what merchants may do across the entire U.S. marketplace.

34.    Likewise, Amex's NDPs prevent surcharging on rival networks' credit card transactions as well as on Amex transactions. Visa and Mastercard previously maintained surcharge bans, but they dropped those anticompetitive rules in 2013.  *See In re Payment Card Interchange Fee & Merchant Discount Antitr. Litig*., 986 F. Supp. 2d 207, 232 (E.D.N.Y. 2015). Now, the rules of both Visa and Mastercard provide that merchants may freely surcharge Visa or Mastercard transactions—but only if and when Amex drops its ban on surcharging.  Mastercard's rules, for example, provide "the merchant may surcharge Mastercard Transactions [only] on the same terms under which [Amex] permits the merchant to surcharge [Amex] transactions."  Visa's rules are the same, as are Discover's.  Moreover, it gains a merchant nothing to impose surcharges specifically on the cards of Amex's competitors, because that would only drive consumers to use Amex cards, which are generally more costly than other cards.

35.    Merchants have testified that they would deeply value the opportunity to use incentives to shift transaction volume to cheaper cards, and to encourage card networks to lower fees in exchange for increased volume.  Home Depot, for example, has testified that it would like to tell the card networks "to the extent you lower my costs, I could move volume your way." Southwest Airlines has testified that it wants "the competitive tool" of being able "to reward the

credit card network that… offers [Southwest] the lowest price."  Alaska Air has testified that it wants "tools to play one credit card network against the other," just as it does with vendors in all other facets of its business.  None of these patently procompetitive strategies are possible with the NDPs in place.


**History of Related Litigation**

36.    In *U.S. v. American Express*, 88 F. Supp. 3d 143 (E.D.N.Y. 2015) ("*Amex I*"), the Department of Justice and 17 states sued Amex, challenging its anti-steering rules. Following a six-week trial, the district court found that Amex's rules harmed competition because, among other things, they increased the price of transactions and prevented competitors from making inroads in the marketplace by offering lower prices.  88 F. Supp. 3d at 149.  The court thus held that Amex's rules constitute an unreasonable restraint of trade in violation of Section One of the Sherman Act.

37.    On appeal, the U.S. Court of Appeals for the Second Circuit reversed.  838 F.3d 179 (2d Cir. 2016) ("*Amex II*").  The *Amex II* court accepted that the anti-steering rules increase the price of credit-card transactions to merchants, and that the rules have prevented competitors from gaining share by offering lower prices to merchants.  But the Second Circuit ruled it is insufficient to show that the NDPs cause price increases *to merchants*, or that they prevent networks from competing based on offering lower prices *to merchants*.  Rather, the plaintiffs were obliged to also present evidence of the effect on cardholders.  If the increased costs to merchants are offset and outweighed by increased benefits provided to cardholders, the *Amex II* court reasoned, then the rules do not harm competition *overall*, taking cardholders and merchants together.  And, the Second Circuit ruled, the government plaintiffs failed to adduce evidence on the cardholder side of the "two-sided market."  Thus, for that reason alone, it reversed the trial

court and directed judgment against the government. The Second Circuit's decision was then affirmed by the Supreme Court in *Ohio v. American Express,* 138 S. Ct. 2274 (2017).

38.    Following *Amex II* and *Ohio*, courts have recognized a simple formula for determining whether a challenged rule has increased prices in a two-sided market. Courts now ask whether the price increase on one side of the market (to merchants, in this case) is outweighed by rebates and rewards provided to the other side (to cardholders, in this case).  *US Airways, Inc. v. Sabre Holdings Corp*., 938 F.3d 43, 56 (2d Cir. 2019).

39.    Likewise, to show competitive harm based on barriers to entry and expansion, courts must now ask whether the challenged rule prevents competitors from entering the market, or from gaining share in the market, by offering lower prices *on a two-sided basis*, and not simply on the merchant side.  *Id*.

**The NDPs Are Unlawful Under The Rule Of Reason.**

40.    This case is governed by the so-called "rule of reason" test for determining unlawful restraints of trade under antitrust law.

41.    Under the rule of reason, the claimant bears the prima facie burden of showing harm to competition.  In cases involving a two-sided market—such as the payment card markets—a claimant may satisfy this burden by adducing evidence that a challenged restraint has increased two-sided prices in the market, or that it has made entry or expansion in that market "extraordinarily difficult" for a firm that seeks to compete by offering lower two-sided prices.

42.    Where the claimant provides direct evidence of harm to competition, the prima facie burden is satisfied.

43.    Alternatively, where plaintiffs are unable to present direct evidence of harm to competition, they may attempt to satisfy their burden under the "indirect method" of proof, by

showing that the defendant possesses market power in a rigorously defined market and that the restraint is "likely" to cause harm.

44.    Here, plaintiffs will present real-world direct evidence showing that the NDPs increase the two-sided price of transactions and impose extraordinary barriers to entry and expansion in the relevant market.  The relevant market for assessing harm to competition in this case can be defined either as (i) the U.S. market for credit and debit card transactions, or (ii) the U.S. market for credit-card transactions.  It makes no difference in this case which of these definitions is employed.  Additionally, plaintiffs will show that Amex has market power in the relevant market.

45.    Once a plaintiff has made its prima facie showing of harm to competition, the burden shifts to the defendant to prove by a preponderance of the evidence that procompetitive benefits of the challenged restraint justify the harm to competition.

46.    If the defendant can do that, the burden shifts back to the plaintiff to show that the procompetitive benefits could be achieved by means less restrictive of competition.  In this case, there are no procompetitive justifications for the NDPs, and any potential justifications that Amex may identify can be achieved by means less restrictive of competition.

**The NDPs Harm Competition By Creating Barriers To Entry And Expansion.**

47.    The NDPs harm competition by making it impossible for new entrants or a maverick network to compete by offering lower merchant fees, even if that network also offers cardholder rewards on par with rival networks.

48.    Evidence that a restraint makes it "extraordinarily difficult" to compete or enter based on offering lower two-sided prices is a "type[] of harm that [is] cognizable when analyzing both sides of a two-sided platform."  *US Airways*, 938 F.3d at 62 (citing *Ohio*, 138 S. Ct. at 2284).

Here, the NDPs have made it "extraordinarily difficult" for a network to enter or expand in the market for credit-card transaction services by charging a lower two-sided price than its competitors charge.

49.      Discover CEO Roger Hochschild has testified at length that Amex's NDPs and the since-rescinded similar rules of Visa and Mastercard fully thwarted attempts by Discover to use lower merchant prices, coupled with its industry-leading cash-back awards, to gain volume from its competitors. *See Amex I*, 88 F. Supp. 3d at 213-14.

50.      After Visa and Mastercard dropped their rules, Mr. Hochschild testified that if Amex's NDPs were rescinded, Discover would once again want to "aggressively pursue a strategy of lowering our prices and providing incentives to merchants that would steer volume to Discover." Until that time, however, "a lowest-cost provider strategy cannot succeed in the network services market if merchants are unable to shift share among the various networks." *Amex I*, 88 F. Supp. 3d at 152.

51.      For the same reasons, a new entrant into the card network business could not make inroads by offering cheaper service. This explains why there has not been a new general purpose credit card network since Discover's launch in 1985—a staggering length of time in any industry.

**The NDPs Harm Competition By Increasing The Two-Sided Price Of Transactions.**

52.      Amex's NDPs further harm competition because they increase the cost of transactions on a two-sided basis.  This conclusion is supported by abundant direct evidence.

53.      First, when merchants are permitted to use steering tools like surcharges and discounts for specific credit-card brands, empirical evidence shows that many cardholders switch to cheaper payment products.  When cardholders make that switch—e.g., to Discover, or to debit— the merchants realize savings that are easily quantifiable, based on publicly available data.  The

data also show that these merchant savings greatly outweigh any diminution in rewards to cardholders.

54.     For example, when an Amex cardmember responds to a prompt (whether a differential surcharge or other form of steering) by switching to Discover for a given transaction, the merchant saves roughly 15% of the swipe fee it would have incurred on that transaction, and the cardholder enjoys rewards that are as rich or richer than those it would have gotten from Amex on the transaction.  Thus, the bans on differential surcharging and other steering techniques increase the two-sided price of the transaction insofar as they thwart switching volume to cheaper credit card products.

55.     The analysis with parity surcharging is similar.  Direct empirical evidence shows that, when all credit cards are surcharged but debit cards are not, cardholders shift to debit in very significant numbers.  On each transaction that shifts from Amex to debit, the merchant saves roughly 65% of what it would have paid in merchant fees. The cardmember sacrifices rewards— because debit cards do not usually offer rewards—but that diminution is vastly outweighed by the merchant savings, as demonstrated by Amex's financial reporting.

56.     The rule against parity surcharging thus increases the two-sided price of the transaction, as a matter of direct evidence.

57.     The fact that Amex's ban on surcharging increases two-sided prices is further evident from Amex's experience in Australia, which serves as a natural experiment.  In the early 2000s, all credit card networks were forced to drop their surcharge bans by Australian regulatory authorities.  At the time of the rule change, the average merchant discount fee on Amex was over 2.5% in Australia – similar to the U.S.  Now, the average rate is roughly half that amount.  Extensive real-world evidence shows that merchants of all sizes have routinely received substantial

reductions in swipe fee levels to ensure they do not differentially surcharge Amex card transactions.

58.     And Amex has *increased* its rewards offerings in Australia in the face of merchant steering and surcharging.  As its longtime CEO Kenneth Chenault told investors, "We actually did have a decline in our discount rate" in Australia, after differential surcharging became permissible. "However," he emphasized, "we did not strip down the loyalty products, [instead] we actually strengthened them."  The reason why is clear: rewards make cardholders more "resistant to steering," as Amex's worldwide pricing chief has testified.  The Australian experience thus provides powerful additional evidence that bans on merchant steering and surcharging inflate the two-sided price of transactions.

59.     Empirical evidence from the United States likewise shows that, after Visa rescinded its surcharge ban in 2013, some merchants used the threat of surcharging to extract significant rate concessions, with no corresponding offset to cardholder rewards.  In other words, the two-sided price of credit card transactions dropped.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2024 WL 278565, at *22 (E.D.N.Y. Jan. 8, 2024) (finding that the "two-sided price fell after the elimination of the [No-]Surcharge Rule" by Visa and Mastercard and holding that this "is itself evidence that the two-sided price was supracompetitive").  While merchants are no longer able to extract such concessions from Visa or Mastercard (because the threat of any merchant dropping Amex in order to surcharge rivals' transactions at this point is simply not credible, given Amex's market power), the natural experiment of Visa from 2013 shows that NDPs increase the two-sided price.

60.     Moreover, extensive direct evidence shows that, with the NDPs in place, the prices charged by Amex and its rivals are supracompetitive.  Like Amex and Mastercard, Amex earns

profits substantially "above those needed to compensate all factors of production." *Id.*, at *23. Elimination of the NDPs will have the effect of reducing Amex's stockholder profits—and not of reducing the benefits that Amex offers to its cardholders, which Amex regards as necessary to drive spending on the Amex network. Indeed, Amex executives recognize that, if Amex were to cut back on rewards spending, its fortunes would decline precipitously.

## Class Action Allegations

61.     Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(b)(2), to restrain Amex's ongoing unlawful practices, and under Fed. R. Civ. P. 23(c)(4) to obtain a judicial declaration establishing Amex's liability and enabling class members to prosecute their claims for compensation in separate proceedings before courts and/or arbitral bodies of competent jurisdiction.

62.     Plaintiffs seek certification of an injunctive relief class under Rule 23(b)(2). The proposed class is comprised of the 5,155 merchants described above, as to each of which Amex has waived the right to compel arbitration (the "Class"). Each member of the Class accepts Amex-branded payment cards pursuant to the terms set forth in the MOG, including the NDPs, and has standing to seek injunctive relief rescinding the NDPs.

63.     The members of the Class—numbering 5,155—are so numerous that joinder of all members is impracticable.

64.     There are questions of law or fact common to the Class including, among other things, whether Amex's NDPs have harmed competition in the relevant market; whether there exist non-pretextual procompetitive justifications for Amex's anticompetitive conduct; and whether any allegedly procompetitive objectives could be achieved by means less restrictive of competition than imposition of the NDPs.

65.    The claims of the plaintiffs are typical of the claims of the members of the Class.

66.    Plaintiffs and their counsel will fairly and adequately represent the interests of the Class.  Plaintiffs have retained counsel who are competent and experienced in federal antitrust and class action litigation.

67.    Amex has acted and continues to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the Class as a whole is appropriate within the meaning of Federal Rule of Civil Procedure 23(b)(2).

68.    Moreover, an issue-class judgment under Rule 23(c)(4) declaring that Amex has violated federal antitrust laws would materially advance the resolution of each Class member's individual suit for damages. If liability is established, each Class member may then pursue its individual damages claim in simplified proceedings, whether before this Court or another court or arbitrator having jurisdiction.  If Amex wins, the claims will be disposed of by res judicata.  Either way, class treatment will "materially advance multiple civil claims by addressing the core of the dispute in a manner superior to other realistic procedural alternatives, so as to generate significant judicial efficiencies." ALI Principles of the Law of Aggregate Litigation §2.02 (2010). *See* Manual for Complex Litigation, Fourth § 21.24, at 273 (aggregate treatment of common issues warranted where "it permits fair presentation of the claims and defenses and materially advances the disposition of the litigation as a whole.")

## CLAIM FOR RELIEF

(On Behalf of the Class for Injunction under Section 16 of the Clayton Act,
Based on Violation of Sherman Act Section 1)

69.    Plaintiffs repeat and reallege the foregoing paragraphs.

70.    Amex's NDPs, and the MOG and merchant contracts that incorporate the NDPs, comprise unlawful contracts in restraint of trade, within the meaning of Section One of the Sherman Act, 15 U.S.C. § 1.

71.    Plaintiffs and the Class have suffered injury to their business as a result of American Express's violation of the Sherman Act.

72.    As a direct and foreseeable result of Defendants' willful and ongoing imposition and enforcement of the NDPs, the Class has suffered irreparable injury for which there is no adequate remedy at law, including injuries that are likely to accumulate and continue if not enjoined.

73.    Plaintiffs and the Class are entitled to injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

**WHEREFORE**, Plaintiffs seek:

A.    A judicial declaration that American Express has violated Section One of the Sherman Act;

B.    Injunctive relief directing American Express: to rescind its NDPs, to an extent to be determined at trial; to modify accordingly all iterations of the card acceptance rules that Amex publishes on its websites, including the MOG; and to publish information sufficient to educate the general public concerning the permissible scope of credit card steering and surcharging;

C.    An Order directing the award of costs and attorneys' fees, pursuant to 15 U.S.C. § 26; and

D.     Such other relief as this Court deems just and proper.


Dated:  March 21, 2024


LEONE LAW LLC

*s/ Anthony Leone*

_____

Anthony Leone (# 6099)
1345 Jefferson Blvd.
Warwick, Rhode Island  02886
(401) 921-6684
aleone@leonelawllc.com

GUPTA WESSLER PLLC
Deepak Gupta*
Eric F. Citron*
Thomas Scott-Railton*
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com
thomas@guptawessler.com

MILBERG COLEMAN PHILLIPS BRYSON GROSSMAN PLLC
Scott C. Harris*
Dan K. Bryson*
900 West Morgan Street
Raleigh, NC  27603
(919) 600-5000
sharris@milberg.com

MILBERG COLEMAN PHILLIPS BRYSON GROSSMAN PLLC
Peggy J. Wedgworth*
405 East 50th Street
New York, NY  10020
(212) 594-5300
pwedgworth@milberg.com

21

**SONG P.C.**
Tracey Kitzman*
26 Broadway, 8th Floor
New York, NY  10004
(212) 599-0700
tkitzman@song.law

**LAW OFFICES OF ROBERT W. COHEN, P.C.**
Robert W. Cohen*
1901 Avenue of the Stars, Suite 1901
Los Angeles, CA 90067
Tel: (310) 282-7586; Fax: (310) 282-7589
rwc@robertwcohenlaw.com

*Counsel for Plaintiffs*

*\*Pro hac vice application forthcoming*