# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

5-STAR GENERAL STORE, et al.,

            Plaintiffs,

v.

AMERICAN EXPRESS CO., et al.,

            Defendants.

Case No.  24-cv-00106-MSM-LDA

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION TO COMPEL ARBITRATION

## TABLE OF CONTENTS

Statement of the case ........................................................................................................3

Argument ....................................................................................................................... 8

I.     In determining whether to compel arbitration, this Court must first decide
       whether Amex defaulted in arbitration....................................................................8

II.    Amex defaulted by refusing to pay the filing fees required by the forum
       that Amex picked under the rules Amex chose .....................................................12

       A.     Amex can't compel arbitration after refusing to pay its filing fees.............12

       B.     Amex can't escape its default by relitigating the AAA's application
              of its own rules ............................................................................................15

       C.     Courts have consistently refused to allow defendants to evade their
              own defaults by reference to "no-waiver" clauses..................................... 18

       D.     There is nothing improper about asking that Amex follow the rules
              that the company itself selected ................................................................. 19

III.   The merchants bring the same antitrust claims and seek the same relief in
       this Court as they did in the AAA........................................................................ 23

       A.     The complaint states the same claims as the AAA demands.................... 23

       B.     The scope of injunctive relief sought is the same in the AAA
              demands and the complaint....................................................................... 25

       C.     The merchants' theory of harm to competition is the same before
              the AAA and before this Court. ................................................................ 27

Conclusion ....................................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Abernathy v. DoorDash, Inc.*,
    438 F. Supp. 3d 1062 (N.D. Cal. 2020).......................................................................21, 22

*Adams v. Postmates, Inc.*,
    2020 WL 1066980 (N.D. Cal. Mar. 5, 2020) ............................................................21, 22

*Advisors, Inc. v. Tocqueville Asset Mnagement, L.P.*,
    850 N.E.2d 653 (N.Y. 2006)...................................................................................................13

*American Express Company v. Italian Colors Restaurant*,
    570 U.S. 228 (2013) .............................................................................................................. 1, 4

*Boateng v. General Dynamics Corp.*,
    473 F. Supp. 2d 241 (D. Mass. 2007)................................................................................. 10

*Brown v. Dillard's, Inc.*,
    430 F.3d 1004 (9th Cir. 2005) ........................................................................................ 10, 14

*Brown v. Peregrine Enterprises, Inc.*,
    2023 WL 8800728 (2d Cir. 2023) ..................................................................................... 16

*Burton v. Ghosh*,
    961 F.3d 960 (7th Cir. 2020) ........................................................................................24, 25

*CellInfo, LLC v. American Tower Corp.*,
    506 F. Supp. 3d 61 (D. Mass. 2020) ............................................................................... 22

*Continental Airlines, Inc. v. United Air Lines, Inc.*,
    136 F. Supp. 2d 542 (E.D. Va. 2001)................................................................................ 6

*Dealer Computer Services, Inc. v. Old Colony Motors, Inc.*,
    588 F.3d 884 (5th Cir. 2009) ...............................................................................................15

*Diagnostic Mobile Imaging, Inc. v. Salamanca District Hospital*,
    594 N.Y.S.2d 920 (N.Y. App. Div. 1993).......................................................................... 19

*Doctor's Associates, Inc. v. Distajo*,
    107 F.3d 126 (2d Cir. 1997).................................................................................................25

*Ehleiter v. Grapetree Shores, Inc.*,
    482 F.3d 207 (3d Cir. 2007) ............................................................................................... 9

*Espinoza v. Galardi South Enterprises,*
    2017 WL 9511098 (S.D. Fla. 2017) ................................................................... 22

*FPE Foundation v. Cohen,*
    801 F.3d 25 (1st Cir. 2015) .................................................................... 23, 24

*Freeman v. SmartPay Leasing, LLC,*
    771 F. App'x 926 (11th Cir. 2019) ............................................................. 10

*Gaudreau v. My Pillow, Inc.,*
    2022 WL 3098950 (M.D. Fla. 2022) ........................................................... 24

*Gilmore v. Shearson/American Express, Inc.,*
    811 F.2d 108 (2d Cir. 1987) ..................................................................... 24

*Gray Holdco, Inc. v. Cassady,*
    654 F.3d 444 (3d Cir. 2011) ..................................................................... 18

*Grigsby & Associates, Inc. v. M Securities Investment,*
    664 F.3d 1350 (11th Cir. 2011) ................................................................... 9

*Gulfstream Aerospace Corp. v. Mayacamas Corp.,*
    485 U.S. 271 (1988) ................................................................................ 24

*Hernandez v. Acosta Tractors, Inc.,*
    898 F.3d 1301 (11th Cir. 2018) ............................................................ 10, 13

*Howsam v. Dean Witter Reynolds, Inc.,*
    537 U.S. 79 (2002) ................................................................................... 8

*Image Technical Service, Inc. v. Eastman Kodak Co.,*
    1996 WL 10173 (N.D. Cal. Feb. 28, 1996) ................................................... 6

*In re American Express Anti-Steering Rules Litigation,*
    433 F. Supp. 3d 395 (E.D.N.Y. 2020) ......................................................... 4

*In re Intuniv Antitrust Litigation,*
    2021 WL 517386 (D. Mass. 2021) .............................................................. 12

*In re Tyco International Limited Securities Litigation,*
    422 F.3d 41 (1st Cir. 2005) .............................................................. 11, 13, 17

*Intuit Inc. v. 9,933 Individuals,*
    2021 WL 3204816 (Cal. Ct. App. July 29, 2021) ........................................... 21

*Johnson Associates Corporation v. HL Operating Corporation,*
    680 F.3d 713 (6th Cir. 2012) ........................................................ 2, 18

*JPD, Inc. v. Chronimed Holdings, Inc.,*
    539 F.3d 388 (6th Cir. 2008) ........................................................ 9

*Krinsk v. SunTrust Banks, Inc.,*
    654 F.3d 1194 (11th Cir. 2011) .................................................... 23

*Lifescan, Inc. v. Premier Diabetic Services, Inc.,*
    363 F.3d 1010 (9th Cir. 2004) ..................................................... 16

*Liu v. Equifax Information Services, LLC,*
    2024 WL 308089 (D. Mass. 2024) .............................................. 23, 24

*Manasher v. NECC Telecom,*
    310 F. App'x 804 (6th Cir. 2009) ............................................... 23, 25

*Marie v. Allied Home Mortgage Corporation,*
    402 F.3d 1 (1st Cir. 2005) ........................................................ *passim*

*Martin v. Yasuda,*
    829 F.3d 1118 (9th Cir. 2016) .................................................... 9

*Morgan v. Sundance, Inc.,*
    596 U.S. 411 (2022) ...................................................... 2, 12, 13, 17

*National Union Fire Insurance Co. of Pittsburgh, P.A. v. NCR Corp.,*
    376 F. App'x 70 (2d Cir. 2010) ................................................... 18

*NAVCAN.DC, Inc. v. Rinde,*
    2023 WL 6622207 (S.D.N.Y. Oct. 11, 2023) ............................... 13

*Noble Capital Fund Management, L.L.C. v.*
    *US Capital Global Investment Management, L.L.C.,*
    31 F.4th 333 (5th Cir. 2022) ..................................................... 10, 15

*Ohio v. American Express Co.,*
    585 U.S. 529 (2018) ................................................................ 27, 28

*Optima Media Group Limited v. Bloomberg L.P.,*
    383 F. Supp. 3d 135 (S.D.N.Y. 2019) ........................................ 19

*Pre-Paid Legal Services, Incorporated v. Cahill,*
    786 F.3d 1287 10th Cir. 2015) ........................................ 2, 10, 11, 13

*Rankin v. Allstate Insurance Company*,
    336 F.3d 8 (1st Cir. 2003) ............................................................. 2, 12

*Republic Insurance Company v. PAICO Receivables, LLC*,
    383 F.3d 341 (5th Cir. 2004) ........................................................... 18

*S & R Co. of Kingston v. Latona Trucking, Inc.*,
    159 F.3d 80 (2d Cir. 1998) ............................................................. 18

*Sempra Energy Resources v. California Department of Water Resources*,
    2008 WL 2373791 (Cal. Ct. App. 2008) ......................................... 24

*Sink v. Aden Enterprises, Inc.*,
    352 F.3d 1197 (9th Cir. 2003) .................................................... 10, 14

*Soto-Fonalledas v. Ritz Carlton San Juan Hotel Spa & Casino*,
    2010 WL 1328944 (D.P.R. 2010) .................................................... 12

*Stowell v. Toll Brothers*,
    2007 WL 30316 (E.D. Pa. Jan. 4, 2007) ......................................... 13

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ...................................................................... 28

*Tillman v. Tillman*,
    825 F.3d 1069 (9th Cir. 2016) ....................................................... 15

*Trout v. Organización Mundial de Boxeo, Inc.*,
    965 F.3d 71 (1st Cir. 2020) ............................................................ 12

*Uber Technologies, Inc. v. American Arbitration Association, Inc.*,
    204 A.D.3d 506 (2022) .................................................................. 21

*Wallrich v. Samsung Electronics America, Inc.*,
    2024 WL 3249646 (7th Cir. July 1, 2024) ................................... 15, 16

*Wilk v. American Medical Association*,
    895 F. 2d 352 (7th Cir. 1990) .......................................................... 6

*Williams v. Buffalo Public Schools*,
    758 F. App'x 59 (2d Cir. 2018) ..................................................... 19

*Williams v. Doyle*,
    494 F. Supp. 2d 1019 (W.D. Wis. 2007) ......................................... 28

**Statutes**

1 Domke on Commercial Arbitration § 18:8.50 ...............................................................13

9 U.S.C § 3 ..........................................................................................................*passim*

9 U.S.C. § 10 .............................................................................................................17

For years, American Express has fought to force small businesses to arbitrate their antitrust claims against the company. All the way up to the Supreme Court, Amex was able to successfully block merchants from suing in court, even when the cost of arbitration was more than the merchants could recover in damages. *See American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013). So when the plaintiffs here—5-Star General Store & Deli in Pawtucket, Rhode Island, and thousands of other small merchants—wanted to challenge Amex's onerous swipe fees and anticompetitive contracts, they had to do so in the forum that Amex chose, under the rules that Amex selected. And that's what they did, filing arbitration demands before the American Arbitration Association under the AAA's rules.

Once in arbitration, however, a strange thing happened. When the AAA told Amex that it needed to pay significant filing fees under the AAA's rules, the company balked. While the merchants paid their share of the filing fees, Amex refused. The AAA explained that it couldn't proceed with the arbitration without those fees. When Amex still wouldn't budge, the AAA terminated the arbitrations. The merchants, having wasted months unsuccessfully trying to arbitrate their claims, then brought this suit in federal court. They sought the same thing they sought in arbitration: equitable relief against Amex's anticompetitive conduct. And they explained how Amex, by refusing to pay its fees, had waived its right to compel arbitration.

But Amex doubled down. It now claims that this Court lacks the power to decide whether the company defaulted in arbitration. Instead, Amex maintains, this Court must send the parties *back* to arbitration to decide that question—even though Amex has already made clear that it believes it is entitled to ignore arbitral decisions it doesn't like. If Amex's view were to prevail, arbitration (and its fees) would be mandatory for small businesses like 5-Star General Store, but optional for a massive credit-card company like Amex. And arbitration, which is supposed to be a

method for speedy resolution of disputes, would become a game of procedural ping-pong, where plaintiffs must spend years shuttling between different forums before their cases can even begin.

Neither the Federal Arbitration Act nor precedent permit that result. Courts may compel arbitration only if the party seeking arbitration "is not in default in proceeding with such arbitration," which includes waiver of the right to arbitrate. 9 U.S.C § 3. While Amex says that this Court cannot answer that statutorily mandated question, the First Circuit holds the opposite: This question "is presumptively an issue for the court," so that parties are not "bounced back and forth between tribunals without making any progress." *Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 14 (1st Cir. 2005). And courts across the country have consistently refused to compel arbitration on behalf of parties that won't pay their filing fees. *See, e.g.*, *Pre-Paid Legal Servs., Inc. v. Cahill*, 786 F.3d 1287, 1293–98 (10th Cir. 2015).

Amex's other arguments likewise rely on either ignoring or mischaracterizing relevant authority. Amex claims that there is a heightened waiver standard due to the public policy favoring arbitration, but the Supreme Court just held the opposite. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022). The company claims New York law applies, but under the Federal Arbitration Act, "federal law would automatically govern waiver issues." *Rankin v. Allstate Ins. Co.*, 336 F.3d 8, 12 n.3 (1st Cir. 2003). And while Amex claims that a "no waiver" clause in its contract controls, courts have consistently held that "[t]he presence of a 'no waiver' clause does not alter the ordinary analysis undertaken to determine if a party has waived its right to arbitration." *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 717 (6th Cir. 2012) (citing cases).

Beyond that, Amex seeks to muddy the waters by trying (at length) to relitigate the merits of the AAA's application of the AAA's own rules. The company is wrong under the plain text of those rules, which set $3,500 as the filing fee for "Nonmonetary Claims" seeking injunctive relief. But more importantly, under the rules that Amex itself selected, the question of fees is reserved for

the AAA. So this Court is not a forum for *de novo* review of whether the AAA properly applied its own rules. Instead, the only three facts necessary to resolve this motion are simple and undisputed. First, the AAA determined that the $3,500 fee for nonmonetary claims applies. Second, Amex refused to obey the AAA's ruling. And third, the AAA terminated the arbitration as a result.

In keeping with the Federal Arbitration Act and First Circuit precedent, this Court should reject Amex's attempt to force the merchants back into arbitration—where Amex has shown that it refuses to play by any rules but its own.

## STATEMENT OF THE CASE

**A.** 5-Star General Store & Deli is located on Main Street in Pawtucket, where it sells sandwiches, coffee, and groceries to the community. The store accepts all major credit and debit cards, including Amex. Dkt. 1 ¶ 19. So do the other merchants in this case, which include Marc Allen, a men's clothing store in Providence; Meze Estiorario, a Greek restaurant in Worcester, Massachusetts; and Kennedy's Restaurant & Market, a family business and a local institution in Marlborough, Massachusetts. *Id.* ¶¶ 20–28. These merchants have little choice in the matter, as 99% of credit-card accepting merchants in the United States accept Amex. And a failure to accept Amex would mean a loss of business they can ill afford to spare.

Accepting Amex cards isn't cheap. Amex charges expensive "swipe fees," requiring the merchants to pay the company around 3% or more of each credit-card sale. That is a heavy toll for small businesses—like local retailers and family restaurants—that operate on tight margins. For such merchants, credit-card swipe fees might eat up half or more of what the owner can take home at the end of the month. Yet Amex's rules bar merchants from offering a discount to customers for using a cheaper payment product, from assessing a small fee (or surcharge) for using Amex, or even from simply asking customers to please use a cheaper credit card. Amex is alone in this. As a result of successful antitrust litigation, Visa, Mastercard, and Discover now permit merchants to engage

in those practices. But as a practical matter, Amex's rules apply across-the-board; even though Visa's rules permit steering, a merchant cannot use signage to steer a Visa holder to use debit because that practice would violate Amex's rules.

**B.** Amex's ability to maintain these onerous rules is in no small part thanks to the company's arbitration clauses. When small merchants tried to bring antitrust suits against Amex in federal court, the company successfully prevented them from doing so. *See American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013) (upholding Amex clause requiring one-on-one arbitration of any dispute); *In re American Express Anti-Steering Rules Litig.*, 433 F. Supp. 3d 395 (E.D.N.Y. 2020) (compelling arbitration of merchant challenges to Amex's anti-steering provisions). For years, those arbitration contracts served as an effective bar on the ability of small businesses like 5-Star General Store to vindicate their antitrust claims.

Under the relevant version of the Amex Merchant Operating Guide, all claims must be arbitrated at the request of either party. Ex. A § 13.1.[1] These arbitrations may be brought either in the American Arbitration Association or JAMS, another private arbitration organization. *Id.* § 13.1(i) The arbitrator will apply "the selected organization's rules in effect when the Claim is filed, except where those rules conflict with the Agreement." *Id.* Class actions are prohibited. *Id.* § 13.1(ii). Instead, each arbitration must be an individual, bilateral arbitration between the merchant and Amex. *Id.* Amex's contract emphasizes that "[t]he arbitrator's decisions" are only "subject to very limited review by a court." *Id.* § 13.1. As to fees, the contract provides that the

---

[1] Unless otherwise specified, all exhibit citations refer to exhibits to the Declaration of Scott C. Harris, filed in support of this opposition.

merchant's share of total arbitration expenses is capped at "the amount of the filing fees Merchant would have incurred if Merchant had brought a Claim in court." *Id.* § 13.1(ix).[2]

**C.** Consistent with these requirements, in August 2023, 5-Star General Store and 5,154 other small businesses submitted arbitral demands to the AAA seeking damages and injunctive relief against Amex. Declaration of Scott C. Harris ¶ 5.[3] The parties disagreed as to the amount of fees that both parties owed. *Id.* ¶ 19. But while the merchants and Amex sought to mediate the claims, disputes over fees were deferred—at Amex's urging. *Id.* ¶¶ 15–18.

After mediation was unsuccessful, the parties sought a decision from the AAA as to the applicable filing fee for the injunctive relief claims. Under the AAA Commercial Filing Fee Schedule, the "Initial Filing Fee" for "Nonmonetary Claims" is "$3,500." Ex. C. The rules further state that: "The non-monetary filing fee is the minimum filing fee for *any case* requesting non-monetary relief. Where a party seeks both monetary damages and non-monetary relief, the higher of the two filing fees will apply." Ex. C at 2 (emphasis added).

The merchants pointed out that under the plain text of this rule, the filing fee should be $3,500. Ex. G. And under the arbitration contract Amex drafted, the merchant's share of total arbitration expenses is capped at "the amount of the filing fees Merchant would have incurred if Merchant had brought a Claim in court." Ex. A § 13.1(ix); *see also* Ex. I (AAA determination that

---

[2] This language comes from the April 2023 Merchant Operating Agreement, which was the contract pursuant to which the merchants filed their arbitration demands, was the basis for Amex's argument about the merchants' filing fees, and the contract that the AAA applied. Ex. N at 2; *see also* Ex. E (Amex arguing that each merchant's share of the filing fees should be $402 based on the fees for the Southern District of New York). Before this Court, Amex confusingly attaches a later version of its Merchant Operating Guide that does not include this language. Dkt. 18-6 § 13.1(c)(ix). Yet "Amex did not at any point during the parties' correspondence argue that section 13(ix) of the April 2023 MOG did not apply to the arbitration demands on the grounds that a later version of the MOG applied." Harris Decl. ¶ 20; *see also id.* ¶ 33.

[3] Another cohort of claimants—mostly merchants who no longer operate card-accepting businesses—filed arbitral demands seeking damages only. Harris Decl. ¶ 25.

the relevant court filing fee was $350). Amex, however, argued that the AAA should not apply its normal fee because, if a merchant prevailed in its individual arbitration, the company would supposedly stipulate to injunctive relief for that merchant alone. Ex. E at 4–5. The merchants explained that any such stipulations would not grant them the full relief they sought, since they sought broader market-based relief.[4] Dkt. No. 18-5 at 15 (seeking "[i]njunctive relief preventing American Express from enforcing the Amex Rules against Claimant and against such other merchants as may be necessary to afford Claimant complete relief").

Initially, the AAA was under the misimpression that the merchants were seeking broader injunctive relief only on behalf of "the general public or on behalf of other merchants." Ex. I. After the parties filed letters on this issue, however, the AAA ultimately agreed with the merchants. The AAA stated that because the merchants had "clarified that the individual merchants are bringing injunctive relief claims on behalf of themselves and not solely seeking the contested injunctive relief claims on behalf of others," "we have made the administrative determination, that for the [5,155] claims with both damages claims and injunctive relief claims, that the non-monetary filing fee of

---

[4] While the scope of appropriate relief is not at issue at this stage, courts in antitrust cases can grant marketwide relief to individual plaintiffs, if necessary to ensure competition. *See, e.g.*, *Wilk v. American Medical Ass'n*, 895 F. 2d 352, 371 (7th Cir. 1990) ("some 30,000 chiropractors in the nation as a whole who were not parties to this case" may well "benefit from the relief required by the district court's order. But this does not necessarily make the injunction overbroad"); *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 1996 WL 101173, at \*3 (N.D. Cal. 1996) ("[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled."), *aff'd in relevant part*, 125 F.3d 1195, 1226 (9th Cir. 1997) ("relief in favor of nonparties" is appropriate where "broad scope is necessary to give prevailing parties relief"); *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 136 F. Supp. 2d 542 (E.D. Va. 2001), *vacated on other grounds*, 277 F.3d 499 (4th Cir. 2002) (the "injunctive relief granted in this case should 'effectively pry open competition to a market that was previously closed by illegal restraints' and should not myopically focus solely on Continental's harm").

$3,500 will apply." Ex. N.[5] The AAA then reiterated that this outcome followed from the plain text of the AAA's fee rules:

> Given that each of the 5,155 cases include an injunctive relief claim for an individual claimant in addition to a claim on behalf of others—the individual claim is enough to trigger the application of the non-monetary relief initial filing fee of $3,500. Please see the attached Commercial Fee Schedule where fees for non-monetary claims are defined.

Ex. P.

But Amex refused to pay. Instead, the company stated that it would only pay the fees that it had determined—in its own judgment—were appropriate. Exs. S, T. In the face of this, the AAA reiterated its decision: "As previously stated," "the AAA confirms that … the filing fees for the injunctive relief claims are $3,500." Ex. U. The AAA warned that "[a]bsent receipt of payment for any of the individual cases by the previously established deadline of February 26, 2024, the AAA will administratively close those matters." *Id.*

Amex still wouldn't budge. According to the company, in its own view, the "AAA has no basis for assessing any filing fees for the 5,155 claims asserting claims for injunctive relief." Ex. V. This was despite the fact that the AAA's fee schedule not only sets out the filing fee for claims for injunctive relief, but the AAA rules also provide that such rules "shall be interpreted and applied by the AAA." Ex. B at 17, R-9.

The AAA then issued a final warning:

> We understand it is Respondents' position that they are not obligated to pay the AAA filing fees assessed for the 5,155 damages and injunctive relief claims. These filing fees remain due to the AAA by **February 26, 2024,** pursuant to the AAA's initial determination as referenced above. If payment for the 5,155 cases is not received by February 26, 2024, the cases will be administratively closed.

---

[5] The initial email contained a typo that the AAA later corrected. Ex. P.

Ex. W. And when the AAA "did not receive payment by the previously communicated deadline," it ordered that "these cases are administratively closed for non-payment." Ex. X. Subsequently, the AAA administrators and counsel for the parties participated in a video conference, where the AAA confirmed that the closure of the file was final and not subject to reopening. Harris Decl. ¶ 71.

The merchants subsequently filed this class-action suit in federal court, again seeking injunctive relief for the same antitrust violations. Dkt. 1 at 20–21 ¶¶ A–D. Amex then moved to compel arbitration and strike the class action allegations. Dkt. 18, 19.

## ARGUMENT

### I.    In determining whether to compel arbitration, this Court must first decide whether Amex defaulted in arbitration.

Under section 3 of the Federal Arbitration Act, a court may compel arbitration only if the party seeking arbitration "is not in default in proceeding with such arbitration." 9 U.S.C § 3. A default includes a waiver of the right to compel arbitration. *See Marie v. Allied Home Mortgage Corp.*, 402 F.3d 1, 13 (1st Cir. 2005). Under First Circuit precedent, this is a question of federal law for a federal court to decide. Amex's argument to the contrary—that this Court lacks the power to determine whether Amex waived its right to arbitrate before compelling arbitration—is wrong as a matter of statutory text, precedent, and common sense.

**A.** In *Marie*, the First Circuit set out a simple rule: "[W]aiver by conduct, at least where due to litigation-related activity, is presumptively an issue for the court." 402 F.3d at 14.[6] Amex plucks language out of context from the Supreme Court's decision in *Howsam v. Dean Witter Reynolds, Inc.*, stating that "the arbitrator should decide allegations of waiver, delay, or a like defense to

_____

[6] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

arbitrability." 537 U.S. 79, 84 (2002). But *Marie* explained that that "the Supreme Court in *Howsam* … did not intend to disturb the traditional rule" that waiver based on "litigation-related activity" is "presumptively an issue for the court." 402 F.3d at 14. *Marie* has been quite influential. *See, e.g.*, *JPD, Inc. v. Chronimed Holdings, Inc.*, 539 F.3d 388, 393−94 (6th Cir. 2008) (citing *Marie* and holding "that *Howsam* did not disturb the traditional rule that the courts presumptively resolve waiver-through-inconsistent-conduct claims"); *Martin v. Yasuda*, 829 F.3d 1118, 1123 (9th Cir. 2016) (same); *Grigsby & Assocs., Inc. v. M Sec. Inv.*, 664 F.3d 1350, 1353−54 (11th Cir. 2011) (same); *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 217−18 (3d Cir. 2007) (same).

Amex claims (at 11) that the First Circuit's holding in *Marie* applies only when the "alleged waiver resulted from conduct in the same litigation before the same judge." That's puzzling, since *Marie* itself involved waiver through conduct before a different decisionmaker prior to the suit in federal court—specifically, "litigation activity before the EEOC." 402 F.3d at 14. The plaintiff had filed a charge before the agency, the defendant had responded (instead of seeking to compel arbitration), and the EEOC "issued a Dismissal and Notice of Rights." *Id.* at 4–5. But, the First Circuit explained, it "makes no difference" that this occurred in a separate forum "as opposed to activity before a court." *Id.* "[S]ending the waiver issue to the arbitrator would still be inefficient," and "[c]ourts are still well suited to determine the sort of forum-shopping and procedural issues" that arise through such conduct. *Id.*; *see also JPD*, 539 F.3d at 393−94 (citing *Marie* and explaining that "[w]aiver-through-conduct issues ordinarily turn on whether a plaintiff abused the litigation *or pre-litigation process*, and a court is most adept at policing procedure-abusing conduct" (emphasis added)). Here, the proceedings before the AAA by the same parties involving the same antitrust claims are just as much "litigation activity" as an EEOC proceeding. *Marie*, 402 F.3d at 14.

Consistent with this understanding, courts routinely adjudicate whether conduct in arbitration was a default under section 3. For example, in the Tenth Circuit's widely cited decision

in *Cahill*, the court held that judges (not arbitrators) must determine whether failure to pay arbitration fees was a "default in proceeding with such arbitration." 786 F.3d at 1289, 1295–96, 99 (citing *Marie*, 402 F.3d at 3, 13–14 n.10). Other courts have similarly decided whether a party who failed to pay arbitral fees "defaulted in arbitration" or otherwise lost its ability to seek arbitration under section 3. *Sink v. Aden Enterprises, Inc.*, 352 F.3d 1197, 1199 (9th Cir. 2003); *see also Hernandez v. Acosta Tractors, Inc.*, 898 F.3d 1301, 1305 (11th Cir. 2018); *Noble Cap. Fund Mgmt., L.L.C. v. US Cap. Glob. Inv. Mgmt., L.L.C.*, 31 F.4th 333, 336 (5th Cir. 2022); *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1013 (9th Cir. 2005); *Freeman v. SmartPay Leasing, LLC*, 771 F. App'x 926, 933 (11th Cir. 2019).

The only case that Amex cites in support of its mistaken reading of *Marie* is plainly distinguishable. In *Boateng v. Gen. Dynamics Corp.*, a plaintiff argued that a defendant had waived its right to arbitrate by failing to comply with its own human-resources policy. 473 F. Supp. 2d 241, 249–50 (D. Mass. 2007). The district court distinguished this "non-litigation-related waiver" from *Marie*. *Id.* at 251. But the present case involves litigation-related conduct in arbitration of the kind that courts routinely adjudicate. And Amex does not identify any case holding that a federal court lacks the power to determine whether conduct in arbitration was a default under section 3.

**B.** If there were any doubt about whether *Marie* controls here, the First Circuit's reasoning resolves it. *Marie* explained how the text and context of the FAA indicate that courts must decide this question before they compel arbitration. And *Marie*'s reasoning applies with equal force here.

Start with the text. "[U]nder the FAA, a court is only permitted to stay a court action pending arbitration if 'the applicant for the stay is not in *default* in proceeding with such arbitration.'" *Marie*, 402 F.3d at 12 (quoting 9 U.S.C. § 3). "This language would seem to place a statutory command on courts, in cases where a stay is sought, to decide the waiver issue themselves." *Id.* at 13; *see also id.* at 14 n.10. Other courts have picked up on *Marie*'s "concern about

divesting courts of the power to decide whether a default has occurred under § 3" in holding that "[t]he question of default under § 3 is not reserved for … arbitrators." *Cahill*, 786 F.3d at 1295–96 (citing *Marie*, 402 F.3d at 14 n.10).

The statutory context points the same way. "[S]ending waiver claims to the arbitrator would be exceptionally inefficient" and thus run counter to "a key purpose of the FAA: to permit speedy resolution of disputes." *Marie*, 402 F.3d at 13–14. That's because "[i]f the arbitrator were to find that the defendant had waived its right to arbitrate, then the case would inevitably end up back before the district court with the plaintiff again pressing his claims." *Id.* at 13–14. *Marie* also concluded that judges are "well-trained" to resolve such questions and that waiver "is not likely to be intertwined with the merits of the dispute." *Id.* at 13.

If anything, *Marie*'s concern about a plaintiff being "bounced back and forth between tribunals without making any progress," *id.* at 14, applies with even greater force here, since the parties have *already* been to arbitration once. Under Amex's rule, the merchants could end up going to arbitration first, then to this Court, then back to arbitration, and then back to this Court. But "arbitration clauses were not meant to be another weapon in the arsenal for imposing delay and costs in the dispute resolution process." *Id.* And "as justice delayed may amount to justice denied, so it is with arbitration." *In re Tyco Int'l Ltd. Sec. Litig.*, 422 F.3d 41, 46 (1st Cir. 2005). This Court is eminently capable of determining whether Amex refused to comply with the AAA's fee decision, a question that does not require deciding the merits of the merchants' antitrust claims.

In sum, whether one looks to *Marie*'s rule or its reasons, this Court has the power to determine that Amex defaulted under section 3 of the FAA.

## II.    Amex defaulted by refusing to pay the filing fees required by the forum that Amex picked under the rules Amex chose.

Amex fares no better on the substance of the default analysis. It is undisputed that Amex refused to pay its share of the fees as determined by the AAA. It is also undisputed that the AAA terminated the arbitrations as a result. Faced with similar situations, courts across the country have consistently held that if an arbitration terminates because one party didn't pay its fees, that party cannot then turn around and try to compel the other party back into arbitration. This makes perfect sense. A party defaults if it engages in conduct that is inconsistent with a right to arbitrate. And few things more clearly meet that definition than Amex's conduct in this case. Simply put, a party does not act consistently with a right to arbitrate by deliberately preventing that arbitration from getting started.

### A.    Amex can't compel arbitration after refusing to pay its filing fees.

**1.** As an initial matter, Amex looks to the wrong law. Under the Federal Arbitration Act, "federal law would automatically govern waiver issues." *Rankin*, 336 F.3d at 12 n.3; *see also Trout v. Organización Mundial de Boxeo, Inc.*, 965 F.3d 71, 83 n.11 (1st Cir. 2020) (in arbitration context, "[f]ederal substantive law … governs the issue[] of waiver") (Dyk, J., concurring); *In re Intuniv Antitrust Litig.*, 2021 WL 517386, at *8 (D. Mass. 2021) (same); *Soto-Fonalledas v. Ritz Carlton San Juan Hotel Spa & Casino*, 2010 WL 1328944, at *3 (D.P.R. 2010) (same). Amex cites a choice-of-law provision in its own contract for the notion that New York law applies. Amex Br. 9.[7] But that provision says only that *in arbitration*, "[t]he arbitrator shall apply New York law and applicable statutes of limitations and shall honor claims of privilege recognized by law." Ex. A § 13.1(vii). That

---

[7] Unless otherwise specified, all citations in this brief to Amex's brief refer to Amex's motion to compel arbitration. Dkt. 18.

doesn't govern *this Court's* determination about whether a default occurred under a federal statute. In any event, under either source of law, the result would be the same.

**2.** Under either standard, Amex's refusal to obey the ruling of the forum it selected was "inconsistent with a right to arbitrate." *Marie*, 402 F.3d at 14; *Morgan*, 596 U.S. at 419; *see also Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006). Amex cites an older case for the proposition that "[a]rguments about waiver are even more suspect in the context of agreements to arbitrate." Amex Br. 12 (citing *In re Tyco*, 422 F.3d at 44). But the Supreme Court has recently made clear that the opposite is true, rejecting a heightened burden for proving waiver of the right to compel arbitration: "the FAA's policy favoring arbitration does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Morgan*, 596 U.S. at 418. "Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind," without any extra thumb on the scale "to favor arbitration over litigation." *Id.*

Courts across the country have had little troubling refusing to compel arbitration at the request of a party that didn't pay its filing fees. *See, e.g.*, *Hernandez*, 898 F.3d at 1305 ("Once [the defendant] defaulted in the arbitration [due to non-payment of fees], the District Court would have been within its power to find that [the defendant] could no longer require [the plaintiff] to proceed in arbitration."); *Cahill*, 786 F.3d at 1294 ("[A] party's failure to pay its share of arbitration fees breaches the arbitration agreement and precludes any subsequent attempt by that party to enforce that agreement."); *Stowell v. Toll Bros*, 2007 WL 30316, at *1 (E.D. Pa. 2007) ("Defendant's admission that the filing fee was not paid is sufficient for the court to conclude that Defendant defaulted."); *NAVCAN.DC, Inc. v. Rinde*, 2023 WL 6622207, at *3–4 (S.D.N.Y. 2023) ("Defendants waived the right to arbitrate by failing to pay AAA arbitration fees, having been warned that the AAA would terminate the Prior Arbitration for non-payment."); *Ronan v. Neighborhood Rest. Partners of Fla., LLC*, 2019 WL 13267169, at *2 (M.D. Fla. 2019) (refusing to compel arbitration "because

Defendant failed to abide by [the AAA] rules and timely pay the filing fee"); Failure to pay arbitration fees, 1 Domke on Com. Arb. § 18:8.50 (3d ed. 2023) (compiling cases).

Here, it is undisputed that the AAA decided that the per-claim filing fee was $3,500 and that Amex refused to pay its share of those fees, causing the AAA to terminate the arbitration. It's hard to think of a clearer "default" or something less consistent with the right to arbitrate. Under the contract that Amex drafted, arbitrations before the AAA will proceed under the AAA's "rules in effect when the Claim is filed, except where those rules conflict with the Agreement." Ex. A § 13.1(i). The AAA rules include "Administrative Fee Schedules," which set "the minimum filing fee for any case requesting non-monetary relief" at "$3,500." Ex. C at 2. The AAA's Commercial Arbitration Rules and Mediation Procedures also provide that, with an exception not relevant here, "[a]ll other rules shall be interpreted and applied by the AAA." Ex. B at 17, R-9. Amex even admitted in that the "AAA has broad discretion" over fees and asked the AAA to "exercise that discretion" in the company's favor. Ex. E at 5. Yet Amex then refused to comply with the AAA's application of its own fee rules. That's a default.

Indeed, because it is a private non-profit, "[t]he American Arbitration Association could not compel [Amex] to pay its share of the filing fee, and in the absence of the fee it could not proceed." *Brown*, 430 F.3d at 1013. It would be inconsistent with the FAA's goal of "the efficient and expeditious resolution of claims" for a court "to enter an order returning parties to arbitration upon the motion of a party that is already in default of arbitration." *Sink*, 352 F.3d at 1201. Otherwise, "a party refusing to cooperate with arbitration [could] indefinitely postpone litigation." *Id.* This would disproportionately hurt litigants with fewer resources, who are less able to afford protracted procedural wrangling before even being able to obtain a forum for their claims. It's no coincidence that the parties in this case are a general store and a multi-billion dollar financial institution. Recognizing this, courts have "decline[d] to adopt a rule that would encourage

14

companies to refuse to participate in properly initiated arbitration proceedings" and have made "clear that when [a company] enters into an agreement requiring its [customers] to arbitrate, it must participate in the process or lose its right to arbitrate." *Brown*, 430 F.3d at 1012–13.

**3.** Even if Amex's refusal to pay its fees wasn't a default, courts have declined to compel arbitration when filing fees weren't paid and the arbitration organization terminated proceedings—independent of the reason. These courts have concluded that section 3 of the FAA does not permit a court to compel arbitration once the arbitration "has been had," 9 U.S.C. § 3, which includes termination resulting from nonpayment of fees. *Noble*, 31 F.4th at 336 ("Following the lead of our sister circuits, we conclude that arbitration has been had" when the arbitration organization "terminated the arbitration proceeding following [a party's] nonpayment."); *see also, e.g.*, *Tillman v. Tillman*, 825 F.3d 1069, 1074 (9th Cir. 2016) (same). Thus, when the AAA terminates the arbitration because a party's filing fees weren't paid, the "arbitration was complete" and the parties' recourse is to "pursue their claims on the merits in district court." *Wallrich v. Samsung Elecs. Am., Inc.*, 2024 WL 3249646, at *9 (7th Cir. 2024).

**B.    Amex can't escape its default by relitigating the AAA's application of its own rules.**

Amex's main response is to ask this Court to overrule the AAA's interpretation and application of its own rules. The company's brief is replete with assertions like "AAA inexplicably reversed course and purported to impose higher fees—a position that Amex properly rejected." Amex Br. 14. But the AAA didn't just "purport" to impose higher fees, it exercised its express authority under its rules. Ex. B at 17, R-9. And Amex selected those rules in its contract—the same contract that emphasizes that arbitral decision are "subject to very limited review by a court." Ex. A §§ 13.1, 13.1(i). Further, the general presumption is that "[p]ayment of fees" is a question for the arbitrator "that the trial court should not review." *Dealer Computer Servs., Inc. v. Old Colony Motors,*

*Inc.*, 588 F.3d 884, 887 (5th Cir. 2009); *see also Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1013 (9th Cir. 2004).[8]  Otherwise, a party could always just refuse to pay when it didn't like a decision, grind the arbitration to a halt, and get a second bite at the apple in court.

That's why Amex's lengthy recitation of the parties' arguments before the AAA is beside the point. The question is whether the company refused to comply with the AAA's fee decision, causing the AAA to terminate the arbitration. That's undisputedly what happened. In such cases, "[t]he AAA considered the dispute and terminated the arbitration within its discretion," and a court may not "disturb the AAA's judgment." *Wallrich*, 2024 WL 3249646, at *7. The fact that Amex said it would pay *lower* fees than the ones the AAA ultimately determined were required, Amex Br. 14, is neither here nor there. Similarly irrelevant is whether the AAA had initially thought that lower fees applied (based on a misunderstanding advanced by Amex). Amex Br. 14; *see also* Harris Decl. ¶ 40.[9] Adjudicators form preliminary impressions all the time that they update as they hear argument from the parties. The final decision is what matters. Otherwise, a party could refuse to abide by a judgment of this Court based on the Court's preliminary sense at oral argument.

---

[8] Amex has not argued (nor could it) that the AAA allocated filing fees differently than an express provision in the contract setting the distribution of fees. That distinguishes this case from the situation in an unpublished, out-of-circuit decision Amex cites. Amex Br. 13–14 (citing *Brown v. Peregrine Enterprises, Inc.*, 2023 WL 8800728, at *3 (2d Cir. 2023)). Indeed, here Amex expressly recognized the AAA's "broad discretion" over fee decisions. Ex. E at 5.

[9] Amex, by its own admission, was requesting for the AAA to exercise its discretion to depart from its settled fee schedule to accord Amex favorable treatment "for various practical and policy reasons": "AAA has broad discretion to depart from its published fee schedule where appropriate, and it is our understanding that AAA has done so in other mass arbitrations. We therefore think it would be appropriate here to exercise that discretion and accept a $925 per case filing fee notwithstanding any request for injunctive relief, as was suggested in my prior telephone conversations with both Elizabeth Corsetti and Tacy Zysk." Ex. E at 4–5.

If this Court were to examine the AAA's decision, however, there's little call to second-guess it. The plain text of the AAA rules states that the fee for injunctive relief claims is $3,500. Ex. C. Once the AAA realized that because the merchants were seeking broader injunctive relief than the single-merchant relief to which Amex was willing to stipulate, the AAA recognized that the plain text of the AAA fee schedule applied. Exs. N, P. Amex identifies no actual flaw in this reasoning—much less anything that would warrant overruling the decision of the arbitrator on an issue that Amex's own contract reserves for the AAA. *Cf.* 9 U.S.C. § 10 (granting courts limited jurisdiction to review certain arbitral awards).

Nor was the AAA's decision "out of the blue." Amex Br. 7. As the AAA's letter makes clear, its decision was expressly based on the parties' "emails dated December 28, 2023 and January 5, 2024," and it specifically noted that the merchants had "clarified that the individual merchants are bringing injunctive relief claims on behalf of themselves and not solely seeking the contested injunctive relief claims on behalf of others." Ex. N.

**4.** Amex (at 14–15) argues that certain cases finding default based on non-payment are distinguishable. As an initial matter, these cases predate *Morgan* and so applied a *higher* and since-overturned standard for waiver, which required a showing of prejudice. *See Morgan*, 596 U.S. at 418. More fundamentally, the key question in these cases is whether a party didn't pay its fees. It makes no difference whether the party "only offered to pay *after* AAA administratively closed the cases," "fail[ed] to pay fees after the parties agreed on the timing of and responsibility for payment of arbitration costs," or "the party did not engage with arbitrators to modify the payment schedule." Amex Br. 14 n.10. If anything, Amex's repeated refusal to abide by the AAA's fee decision is more inconsistent with the right to arbitrate than just neglecting to pay or failing to engage. And whether a party does "not agree to participate in the arbitration," or participates but causes the arbitration to terminate by refusing to accept the AAA's decisions, both "directly

conflict[] with the oft-cited principle that arbitration is not meant to be another weapon in the arsenal for imposing delay and costs in the dispute resolution process." *In re Tyco*, 422 F.3d at 44. Despite immaterial factual distinctions, the question is the same: Whether a party willfully failed to pay its fees.

Finally, the fact that Amex is participating in other arbitrations doesn't excuse its refusal to pay its fees here. Amex Br. 15–16. Amex cites no authority for the proposition that Amex can refuse to pay its fees in one arbitration so long as a company is willing to arbitrate other claims involving other parties. Nothing in the FAA permits a company to only comply with arbitral rules when it wants to. And indeed, Amex's admission that it is willing to arbitrate, but only under its own rules, is just a further indication of waiver.

### C.    Courts have consistently refused to allow defendants to evade their own defaults by reference to "no-waiver" clauses.

Amex also asserts (at 12) that it cannot have waived its right to arbitrate because "the parties' arbitration agreement contains a 'no waiver' clause." That's not the law.

"The presence of a 'no waiver' clause does not alter the ordinary analysis undertaken to determine if a party has waived its right to arbitration." *Johnson*, 680 F.3d at 717; *see also Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 348–49 (5th Cir. 2004); *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. NCR Corp.*, 376 F. App'x 70, 73 (2d Cir. 2010); *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 86 (2d Cir. 1998); *Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 453–54 (3d Cir. 2011). Nor would breaking with this consensus be consistent with the statutory text: "[t]he 'default' language in Section 3 of the FAA, which … includes waiver, perhaps gives courts a duty, which cannot be shifted by contract between the parties, to determine whether waiver has occurred." *Marie*, 402 F.3d at 14 n.10. Otherwise, a party could just refuse to cooperate with

arbitration while relying on its "no-default clause" to shield itself from a suit in court—effectively depriving the other party of any forum to press their claims.

Instead of engaging with any of this authority, Amex cites cases that don't involve arbitration. Amex Br. 12–13. Amex does (at 13) appear to quote language supporting its argument from a district court opinion. A footnote reveals, however, that Amex's quoted language is actually from the company's own contract, not the cited decision—which didn't involve arbitration at all. Amex Br. 13 n.8; *see also Optima Media Grp. Ltd. v. Bloomberg L.P.*, 383 F. Supp. 3d 135, 151 (S.D.N.Y. 2019). Amex also relies exclusively on New York law, which (as noted above) does not apply. *See supra* 12. And even under New York law, a no-waiver clause doesn't automatically preclude waiver—including of the right to compel arbitration. *See, e.g.*, *Diagnostic Mobile Imaging, Inc. v. Salamanca Dist. Hosp.*, 594 N.Y.S.2d 920, 921 (N.Y. App. Div. 1993) ("Defendant waived its right to arbitration" under contract with "a non-waiver provision."); *see also generally Williams v. Buffalo Pub. Sch.*, 758 F. App'x 59, 63–64 (2d Cir. 2018) (under New York law, "even though the contract at issue here contains a non-waiver clause, the existence of such a clause does not preclude a waiver of contractual rights") (citing cases)).

### D. There is nothing improper about asking that Amex follow the rules that the company itself selected.

Amex also tries to escape its default through misplaced attacks on the merchants. The company's argument rests on the notion that it was somehow "harassment and extortion" for the merchants to insist that Amex pay its share of the fees under the AAA rules. Amex Br. 18. That's incorrect. But more fundamentally, Amex cites no authority for the proposition that a party is excused from a default in arbitration based on general equitable considerations. None of Amex's handwaving about misconduct gave the company the authority to refuse to accept the AAA's application of its own rules. Indeed, Amex raised the same arguments repeatedly before the AAA,

but the AAA ruled against the company on fees regardless. Exs. N, P. Amex's effort to relitigate this point in court is thus misplaced for the same reasons as above. *See supra* 15–17. To the extent such allegations could ever nullify a default, however, they certainly don't here.

**1.** Nothing required the merchants to remain silent while Amex tried to evade forum rules to its own advantage by misrepresenting the relief the merchants were seeking. The AAA rules state that the initial filing fee for "Nonmonetary Claims" is $3,500. Ex. C.  Amex had given the AAA the misimpression that the merchants were seeking broad injunctive relief only on behalf of "the general public or on behalf of other merchants," rather than for the individual merchant's benefit. Ex. I.[10]  Had the AAA determined that the merchants were not seeking broader injunctive relief on their own behalf, this could have prejudiced the merchants in their individual arbitrations where they would be seeking this broader relief on their own behalf. Nothing in law or equity required the merchants to keep quiet about this. And in the AAA's own words, once the merchants had corrected this misunderstanding by "clarify[ying] that the individual merchants are bringing injunctive relief claims on behalf of themselves and not solely seeking the contested injunctive relief claims on behalf of others," the AAA easily determined that the regular fees for nonmonetary claims applied. Ex. N.

There's also nothing improper about a party insisting on a neutral application of the arbitral rules. The merchants have just as much of a right to insist that Amex follow the AAA rules as Amex has had a right to insist on others doing so for years. The company claims (at 17) that this was improper because higher fees would create more of an incentive to settle. But whether or not

---

[10] Amex's argument was that because it was allegedly willing to "stipulate" to unspecified relief that would give an individual merchant (but no others) an exemption from some or all of the Amex rules "if [that] merchant claimant establishes liability," "[t]his disposes with any need to arbitrate a merchant's right to injunctive relief applying only to itself." Dkt. 18-11 at 3. Amex was never able to square this convoluted argument with the plain text of the AAA's fee schedule.

that's true, it would be a puzzling rule in our adversarial system if a party weren't allowed to point out that an opposing party isn't following the rules because doing so could result in some advantage.

Amex's other allegations of misconduct are just as easily dismissed. The company claims (at 2) that the merchants refused to pay their share of the fees for months. But during that period, Amex was actively disputing the amount of fees the merchants were required to pay. Ex. E. And while the parties were mediating, it was *Amex* that argued that deciding the fee questions at that time was "at odds with one of the primary goals of mediation, which is to avoid paying unnecessary legal costs," Ex. D, and that "[f]ocusing at this stage on the total filing fees that would need to be paid … is premature, counterproductive and, frankly, a fool's errand," Ex. E.[11] And because of the disputes over the fees, the AAA didn't invoice fees for the injunctive relief claims until it had reached its decision. Harris Decl. ¶ 50.

**2.** If anything, equitable considerations point in the other direction. Courts across the country have called out the "hypocrisy" of companies that refused to pay arbitration fees under the agreements the companies themselves drafted and imposed on others. *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1067–68 (N.D. Cal. 2020); *Adams v. Postmates, Inc.*, 2020 WL 1066980, at *6 (N.D. Cal. 2020); *Uber Techs., Inc. v. Am. Arb. Ass'n, Inc.*, 167 N.Y.S.3d 66, 70 (N.Y. App. Div. 2022); *Intuit Inc. v. 9,933 Individuals*, 2021 WL 3204816, at *2 (Cal. Ct. App. 2021). "For decades," companies "have forced arbitration clauses" on others, "thus taking away their right to go to court, and forced class-action waivers upon them too, thus taking away their ability to join collectively to vindicate common rights." *Abernathy*, 438 F. Supp. 3d at 1067. Yet when plaintiffs "wish to enforce

---

[11] The company also asserts that the merchants in this case "never had processed any transactions on American Express cards," Amex Br. 5—when in fact the class here consist only of merchants that Amex itself certified "accept (or did accept at one time) American Express Cards." Ex. H.

the very provisions forced on them," Amex "faced with having to actually honor its side of the bargain, now blanches at the cost of the filing fees it agreed to pay in the arbitration clause." *Id.* at 1068. It "strains credulity" for Amex to argue that this is improper when its "obligation to tender … filing fees" is "a direct result" of the contract that Amex "drafted and which [Amex] requires each [merchant] to sign." *Adams*, 2020 WL 1066980, at *6.

Amex in particular "has succeeded in the United States Supreme Court to sustain … provisions" about arbitration costs that dramatically disadvantage small merchants. *Abernathy*, 438 F. Supp. 3d at 1067; *see also*, *e.g.*, *CellInfo, LLC v. Am. Tower Corp.*, 506 F. Supp. 3d 61, 64–65 (D. Mass. 2020) (detailing how mandatory arbitration limits the ability of those without resources to pursue their claims). Specifically, Amex secured a victory forcing small businesses to arbitrate even "when the plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential recovery." *Italian Colors Rest.*, 570 U.S. at 231; *see also id.* at 240 (Kagan, J., dissenting) (observing that Amex's contract "imposes a variety of procedural bars" that "chok[e] off a plaintiff's ability to enforce congressionally created rights," and in doing so "Amex has insulated itself from antitrust liability—even if it has in fact violated the law"). Yet the moment that Amex finds *its* arbitration costs too onerous, it claims the right to unilaterally refuse to pay.

Finally, this Court need not take the merchants' word for it. This lawsuit is proof positive that the merchants care more about vindicating their rights under antitrust laws than any arbitration fees. The merchants could have gone to court and sought an order compelling arbitration and the payment of fees. *See, e.g.*, *Espinoza v. Galardi S. Enters.*, 2017 WL 9511098, at *1–3 (S.D. Fla. 2017). Instead, 5-Star General Store is asking for nothing more than its day in court.

**III.    The merchants bring the same antitrust claims and seek the same relief in this Court as they did in the AAA.**

In a final effort to keep the merchants out of court, Amex contends that the claims and relief sought in the complaint are so different from those in the merchants' original AAA demands that Amex could not have waived its right to arbitrate the claims before this Court. That's wrong. There no material differences between the two pleadings, and certainly none that rise to the level that would allow a party to act inconsistently with its right to arbitrate and nonetheless still compel arbitration.

**A.    The complaint states the same claims as the AAA demands.**

Section 3 of the FAA allows courts to stay litigation and compel arbitration of a proceeding that is "brought… upon any issue referable to arbitration," so long as "the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. In other words, if a party is in default in proceeding with the arbitration of "an issue referable to arbitration," it waives the right to compel arbitration of that issue. That waiver is set aside only if the plaintiff attempts to significantly change the scope of the dispute. The merchants here have done nothing of the sort.

A party's waiver of the right compel arbitration extends to "the same legal and factual issues," but not "an unrelated … dispute." *FPE Found. v. Cohen*, 801 F.3d 25, 30 (1st Cir. 2015). Courts must therefore determine whether the plaintiff has "fundamentally change[d] the 'scope or theory of the plaintiff's claims.'" *Liu v. Equifax Info. Servs., LLC*, 2024 WL 308089, at *10 (D. Mass. 2024) (quoting *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1202 (11th Cir. 2011)). Or, in other words, whether the plaintiff has "substantially alter[ed] the scope or theory of this matter in such a way as to revive the defendant's right to compel arbitration." *Manasher v. NECC Telecom*, 310 F. App'x 804, 807 (6th Cir. 2009); *see also Burton v. Ghosh*, 961 F.3d 960, 967 n.3 (7th Cir. 2020) (explaining that a "waived defense could not be revived in response to an amended complaint that

did not substantially change the theory or scope of the case"); *Gilmore v. Shearson/American Express, Inc.*, 811 F.2d 108, 113 (2d Cir. 1987), *overruled on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988).

Applying this standard, courts have held that a waived right to arbitrate is not revived even where a complaint adds new causes of action or defendants, so long as the suit arises from the same basic facts. *See, e.g.*, *Gaudreau v. My Pillow, Inc.*, 2022 WL 3098950, at *8 (M.D. Fla. 2022) ("minimally restyling" the claim and denominating "different causes of action" not sufficient to nullify waiver of right to arbitrate); *see also id.* ("[f]ar from expanding the scope, Plaintiffs' claims in the Corrected Second Amended Complaint arise from the same facts and are nearly identical to those that [defendant] answered," and thus "adding additional defendants does not expand the scope of the litigation"); *Liu*, 2024 WL 308089, at *10 (although complaint "adds allegations regarding [defendant's] conduct," it "nonetheless asserts the same causes of action" and waiver of right to compel arbitration is not nullified). Likewise, the addition of a prayer for restitution has been held insufficient if the plaintiff had previously requested rescission. *Sempra Energy Res. v. California Dep't of Water Res.*, 2008 WL 2373791, at *12 (Cal. Ct. App. 2008) ("DWR's amendment of the cross-complaint to expressly add restitution as a remedy does not significantly broaden the scope or theory of the litigation and does not nullify the Sempra parties' waiver of the right to arbitrate.").

In contrast, in *FPE*, the First Circuit easily rejected an argument that defendants waived the right to arbitrate federal claims because—in an earlier case that was not subject to an arbitration agreement and that raised "substantive[ly] differen[t]" claims—they proceeded with litigation in state court. 801 F.3d at 30. And in *Doctor's Associates, Inc. v. Distajo*, there was no waiver because earlier suits "were simple collection proceedings to recover relatively small amounts of unpaid fees and rents under the franchise agreements and subleases," whereas later suits "attack

24

the validity of the franchise agreement and arbitration clause on a host of different federal and state law grounds." 107 F.3d 126, 133 (2d Cir. 1997).

Under this standard, this case is an easy call. The merchants "did not add a new cause of action, change the theory of liability, change the parties, assert new claims, or otherwise transform the litigation in any way." *Burton*, 961 F.3d at 968. In arbitration, the merchants brought a claim that the "Amex Rules and the card-acceptance agreements that incorporate the Amex Rules comprise unlawful contracts in restraint of trade, within the meaning of Section One of the Sherman Act, 15 U.S.C. § 1." Dkt. 18-3 ¶¶ 60–66. Before this Court, the merchants brought a claim that "Amex's [anti-steering and surcharge provisions], and the MOG and merchant contracts that incorporate the [anti-steering and surcharge provisions], comprise unlawful contracts in restraint of trade, within the meaning of Section One of the Sherman Act, 15 U.S.C. § 1." Dkt. 1 ¶¶ 70–73. Both claims sought additional relief under the Clayton Act, 15 U.S.C. § 26, based on the Sherman Act violation. Dkt. 18-3 ¶¶ 60–66; Dkt. 1 ¶¶ 70–73. Those are the same claims.

Instead, Amex only claims purported differences in the scope of the injunctive relief and in the method of proof for the same claims. Amex Br. 18–20. As explained below, neither of those arguments hold water. *See infra* 25–28. But more importantly, even if correct, that wouldn't "substantially alter" the claims the merchants are pressing, *Manasher*, 310 F. App'x at 807, or constitute a different "issue," 9 U.S.C. § 3.

**B.    The scope of injunctive relief sought is the same in the AAA demands and the complaint.**

Amex is wrong on the facts as well, because the merchants haven't changed the scope of their requested relief. The class action complaint seeks relief "directing American Express [] to rescind its [challenged rules] to an extent to be determined at trial." Dkt. 1 at 20. The AAA

demands sought to enjoin enforcement of the challenged rules against the claimant and also "against such other merchants as may be necessary to afford Claimant complete relief." Dkt. 18-5 at 15 (prayer for relief). And, like the complaint here, the AAA demands recognize that "the question of just how broad an injunction must be to deliver meaningful relief is an issue for the Arbitrator." *Id.* at ¶ 59. Consistent with this, both pleadings sought "[s]uch other relief as this Court" or "the Arbitrator" "deems just and proper." Dkt. 1 at 21; Dkt. 18-5 at 15.

Amex's response is an exercise in hair-splitting. In their AAA demands, the merchants observed that "complete relief requires an injunctive award that not only allows the Claimant itself to freely steer and surcharge transactions, but that further allows Claimant's competitors in its industry and geographic area to steer and surcharge." Dkt. 18-3 ¶ 59. But contrary to Amex's argument (at 19–20), this language merely identifies one element that complete relief "requires," it does not limit the scope of injunctive relief that may be sufficient to provide complete relief. Indeed, the very same paragraph makes clear that the merchants will ask for "injunctive relief that is *as broad as necessary* to redress the Claimant's injury," and that "the question of just how broad an injunction must be to deliver meaningful relief is an issue for the Arbitrator." Dkt. 18-3 ¶ 59 (emphasis added). That's consistent with the AAA rules, which state that "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties." Ex. B at 31, R-49.

Further context in the AAA demands confirm this. The merchants explained that, unless the Amex rules are rescinded, the other credit card networks have no incentive to reduce the swipe fees they charge merchants. *See, e.g.*, Dkt. 18-5 at ¶ 46 ("If the Amex Rules were *rescinded*, [competitor networks] would want to aggressively pursue a strategy of lowering [their] prices and providing incentives to merchants that would steer volume to [them]") (emphasis added); *see also id.* at ¶ 12 ("The result of the Amex Rules is a market where … 'lowering your price [as a card

network] … does not drive incremental sales' because merchants have no ability to steer transactions to the low cost network."). The central idea is that price competition can break out only when the challenged Amex rules are removed from the company's Merchant Operating Guide. The merchants have never suggested—in their AAA demands, in their complaint here, or elsewhere—that any narrower relief would suffice to induce network competition on merchant fees. If these cases had proceeded in arbitration, therefore, it would have come as no surprise to Amex that rescission of the challenged rules, across the U.S. marketplace, is precisely what each plaintiff would be proposing at the remedial stage of the proceedings.

### C.     The merchants' theory of harm to competition is the same before the AAA and before this Court.

Weaker still is Amex's attempt to argue that a change in the method of proof for the merits of the merchants' antitrust claims should allow the company to escape its default. In an antitrust case governed by the rule of reason's burden-shifting regime, like this case, a plaintiff can meet its prima facie burden of showing harm to competition under any of several possible theories of harm. *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). In both the AAA demands and the complaint, the merchants made clear that they are proceeding on two well-accepted theories of harm: (1) that the challenged rules harm competition by increasing the cost of credit-card transactions, and (2) that the rules harm competition by posing unreasonable barriers to entry and expansion.  *See* Dkt. 18-5, at ¶¶ 10–13, 46; Dkt. 1 ¶¶ 4–6, 33–34, 49–50.

These are the same theories of competitive harm. The sole pertinent distinction between the two documents is that, in their AAA demands, the merchants stated that they intend to pursue

the so-called "direct method" of proving harm, whereas in the complaint, merchants stated they would pursue the direct method and also the "indirect method," as a backup. Dkt. 18-5 at ¶ 51.[12]

The direct and indirect methods of proving harm are just that—methods of proof. As in other types of litigation, "direct and indirect methods" of making out a "prima facie case" present "an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510 (2002) (regarding Title VII); *see also Williams v. Doyle*, 494 F. Supp. 2d 1019, 1027 (W.D. Wis. 2007) ("[T]he Supreme Court has squarely rejected any suggestion that plaintiffs are required to plead particular methods of proof in their complaint."). Here, whatever method of proof the merchants might ultimately pursue, their claim—and their theory of competitive harm—remains unchanged as between the AAA demands and the complaint.

## CONCLUSION

This Court should deny Amex's motion to compel arbitration.

Respectfully submitted,

*/s/ Anthony Leone*
ANTHONY LEONE (# 6099)
LEONE LAW LLC
1345 Jefferson Blvd.
Warwick, Rhode Island 02886
(401) 921-6684
aleone@leonelawllc.com

DEEPAK GUPTA*
THOMAS SCOTT-RAILTON*
ERIC CITRON*
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006

---

[12] Under the "direct method" a plaintiff discharges its burden by adducing direct evidence of harm to competition. *Ohio*, 585 U.S. at 542. Under the "indirect method," a plaintiff can discharge its burden by showing *some* evidence of harm, plus showing the defendant has market power. *Id.*

(202) 888-1741
deepak@guptawessler.com

SCOTT C. HARRIS*
DAN K. BRYSON*
MILBERG COLEMAN PHILLIPS BRYSON
GROSSMAN PLLC
900 West Morgan Street
Raleigh, NC 27603
(919) 600-5000
sharris@milberg.com

PEGGY J. WEDGWORTH*
MILBERG COLEMAN PHILLIPS BRYSON
GROSSMAN PLLC
405 East 50th Street
New York, NY 10020
(212) 594-5300
pwedgworth@milberg.com

TRACEY KITZMAN*
SONG PC
26 Broadway, 8th Floor
New York, NY 10004
(212) 599-0700
tkitzman@song.law

ROBERT W. COHEN*
LAW OFFICES OF ROBERT W. COHEN, PC
1901 Avenue of the Stars, Suite 1901
Los Angeles, CA 90067
Tel: (310) 282-7586; Fax: (310) 282-7589
rwc@robertwcohenlaw.com

ANTHONY LEONE (# 6099)
LEONE LAW LLC
1345 Jefferson Blvd.
Warwick, Rhode Island 02886
(401) 921-6684
aleone@leonelawllc.com

* *admitted pro hac vice*

July 3, 2024                    *Counsel for Plaintiffs*

## LOCAL RULE 7(c) STATEMENT

Oral argument is requested on this motion. If the Court would find oral argument useful in resolving this motion, counsel estimate that 30 minutes would be sufficient.

_/s/ Anthony Leone_
ANTHONY LEONE (# 6099)

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2024, I electronically filed the foregoing motion with the Clerk of the Court for the United States District Court for the District of Rhode Island by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Anthony Leone*
ANTHONY LEONE (# 6099)