**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| 5-STAR GENERAL STORE, *et al.*,<br>*Plaintiffs*,<br>vs.<br>AMERICAN EXPRESS COMPANY, *et al.*,<br>*Defendants*. | Case No. 1:24-cv-00106-MSM-LDA |

**ASSENTED TO MOTION OF PROFESSOR ALEXI PFEFFER-GILLETT**
**FOR LEAVE TO FILE AN AMICUS BRIEF IN SUPPORT OF PLAINTIFFS**

Proposed amicus Professor Alexi Pfeffer-Gillett respectfully moves the Court for leave to file an amicus brief in support of the Plaintiffs in this case, 5-Star General Store and other merchants. A copy of the proposed brief is attached hereto. Both Plaintiffs and Defendants have consented to this filing.

Professor Pfeffer-Gillett is a law professor at Washington and Lee University School of Law, where his scholarship and teaching focus on civil procedure, class actions, and consumer protection. His scholarship has appeared in the University of Pennsylvania Law Review, the Minnesota Law Review, the Duke Law & Technology Review, and the California Law Review.

He has written about binding arbitration and, specifically, arbitration's procedures for default. *See* Alexi Pfeffer-Gillett, *Unfair by Default: Arbitration's Reverse Default Judgment Problem*, 171 U. Pa. L. Rev. 459 (2023). His work has been cited in court as an authoritative source on arbitration fees and default by parties. *See, e.g.*, *Buzzfeed Media Enterprises v. Anderson*, Docket No. 2023-0377-MTZ, 2024 Del. Ch. LEXIS 188, at *22 n.102 (Ch. May 15, 2024).

He previously filed amicus briefs on the topic of arbitration in *Flores v. The National Football League*, No. 22-cv-00871, Dkt. No. 88 (S.D.N.Y. Mar. 29, 2023), and *Wallrich v. Samsung*, No. 23-02842, Dkt. No. 59 (7th Cir. Dec. 19, 2023).

Professor Pfeffer-Gillett offers this amicus brief to provide a broader perspective on questions of default and refusal to pay fees in the arbitration context. The proposed brief discusses the nature of defaults both in courts and before arbitration providers. The brief compares the two contexts and highlights the particular issues that arise with defaults in the context of private dispute resolution tribunals that require fees to operate. The brief also describes in detail the procedural framework for initiating arbitrations and how these are both similar and different from those in courts. Finally, the brief lays out how these questions relate to the broader context of the Federal Arbitration Act and its underlying purposes. Proposed amicus believes that this information would be of value to this Court in resolving this dispute and would help complete the picture of this case presented by the parties.

WHEREFORE, proposed amicus Professor Pfeffer-Gillett requests that this Court grant his unopposed motion for leave to file an amicus brief in support of Plaintiffs.

Respectfully submitted by:

July 10, 2024

/s/ Natalia Friedlander
Natalia Friedlander (#10003)
127 Wall St.
New Haven, CT 06511
(203) 432-3928
natalia.friedlander@yale.edu

*Attorney for Alexi Pfeffer-Gillett*

**CERTIFICATION**

I hereby certify that on July 10, 2024, a true copy of this document was delivered electronically using the CM/ECF system to all counsel of record.

/s/ Natalia Friedlander
Natalia Friedlander (#10003)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| 5-STAR GENERAL STORE, *et al.*,<br><br>*Plaintiffs*,<br><br>vs.<br><br>AMERICAN EXPRESS COMPANY, *et al.*,<br><br>*Defendants*. | Case No. 1:24-cv-00106-MSM-LDA |

**[PROPOSED] BRIEF OF AMICUS CURIAE ALEXI PFEFFER-GILLETT**

## TABLE OF CONTENTS

**I. SUMMARY OF ARGUMENT ........ 3**

**II. ARGUMENT ........ 7**

A. Arbitration Agreements Contractually Bind the Parties to Follow Arbitration's Procedural Rules, Including the Provider's Fee Requirements ........ 7

B. Failure to Pay Required Fees Amounts to Default and a Waiver ........ 9

C. Finding Waiver and Denying a Delinquent Party's Motion to Compel Arbitration is Consistent with the Federal Rules of Civil Procedure and the Federal Arbitration Act ........ 15

**III. CONCLUSION ........ 18**

Amicus Alexi Pfeffer-Gillett is a law professor at Washington and Lee University School of Law, where his scholarship and teaching focus on civil procedure, class actions, and consumer protection. He has written about binding arbitration and, specifically, arbitration's procedures for default. *See* Alexi Pfeffer-Gillett, *Unfair by Default: Arbitration's Reverse Default Judgment Problem*, 171 U. Pa. L. Rev. 459 (2023). Amicus has no personal interest in the outcome of this case. Amicus has expertise in this field and an interest in ensuring that arbitration procedures comport with the goals of the Federal Arbitration Act to resolve disputes in a speedy, efficient, and fair manner.[1] This brief is filed with consent of the parties.

## I. SUMMARY OF ARGUMENT

A party in court that fails to respond to claims and proceed with litigation is in default and has waived the right to defend itself. *See* Fed. R. Civ. P. 55(a). Default applies even if the defending party had vigorously argued its position to the court—for example, if a defendant had moved to dismiss claims, lost the motion, and then refused to answer the complaint—and even if the court had previously indicated that it might side with the party but ultimately changed its mind. The party's disagreement with the court's decision is irrelevant; what matters is the failure to defend the claims in compliance with the court's decision.

But there is potential confusion in a similar scenario when arbitration is involved, even if the ultimate answer is the same. Arbitration providers, like courts, have complex rules. *See* Pfeffer-Gillett at 483–88 (parsing the fee-payment requirements of leading arbitration providers). And these rules, like rules of civil procedure, may be subject to interpretation and open to argument.

[1] Amicus certifies that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person—other than the amicus curiae or his counsel—contributed money that was intended to fund preparing or submitting the brief.

Arbitration providers, like courts, have authority to resolve competing arguments and issue orders to ensure speedy resolution of claims. Once an arbitration provider issues a decision, it is up to the parties to comply with it.

Here, the AAA issued a decision that required Amex to respond to claims by paying a specific sum, which Amex refused to do. Such a failure of a defending party like Amex to comply with the arbitrator's required response is a default, as it would be in court, and the party has therefore waived its right to proceed in arbitration.

Holding defaulting parties accountable is necessarily the province of courts. Only courts, not arbitration providers, can prevent defendant-companies from using arbitration to perpetually stall litigation and avoid liability, because arbitration providers lack any power to compel payment of fees. The providers' recourse when one party refuses payment is to decline to arbitrate the claims and administratively close the case. The Federal Arbitration Act addresses the limited ability of arbitration providers to compel participation from unwilling parties, permitting parties to file an application to stay court action and refer the case to arbitration, but only if "the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. In this case, American Express has defaulted in the AAA arbitration proceedings by refusing to pay its required fees, and it has therefore waived its contractual entitlement to compel arbitration.

If a pre-dispute arbitration agreement means anything more than a mere get-out-of-jail-free card for the company that drafted it, such contracts must mean that the company is bound by the rules and decisions of its chosen forum. In this case, the AAA's assessment of fees is binding, and Amex's refusal to respond with the required fee payment amounts to a waiver of its right to compel arbitration.

This is not the first time companies have stalled resolution of claims against them by attempting to construct parallel proceedings that would allow them to strategically hop between arbitration and court. In some cases, companies have asked judges to invalidate arbitration clauses they themselves drafted and to require that plaintiffs instead proceed in court as a class action. *See, e.g.*, *Postmates Inc. v. 10,356 Individuals*, No. CV202783PSGJEMX, 2021 WL 540155, at *12 (C.D. Cal. Jan. 19, 2021) (compelling arbitration); *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1065–66 (N.D. Cal. 2020) (same). In others, as here, the companies have refused to pay fees in arbitration and refused to participate in a class action, instead seeking to compel the claims *back* to arbitration, but this time with the court re-writing the arbitration agreement to include terms more palatable to the company. *See, e.g. Mason v. Coastal Credit, LLC,* No. 3:18-CV-835-J-39MCR, 2018 WL 6620684, at *8 (M.D. Fla. Nov. 16, 2018) (defendant-company asking court to compel arbitration to a new service provider after refusing to pay previous provider's fees). As one judge put it, companies' insistence on mandating, before the fact, that dispute resolution be through arbitration, only to later beg that a judge excuse them from complying with their own arbitration terms, amounts to "irony upon irony." *See Abernathy*, 438 F. Supp. at 1068.

A particular irony in these situations is that, as a result of the delinquent party's conduct in arbitration, a system designed to be "efficient" and "streamlined" oftentimes ends up more complex and complicated than simply going to court in the first instance. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). But recognizing and declining to reward Amex's default resolves this irony.

Finding that Amex's failure to proffer its required arbitration fees amounts to a waiver of its right to force the parties back to arbitration is consistent with the two key principles that underlie judicial enforcement of the Federal Arbitration Act: First, arbitration is "a matter of consent," and

pre-dispute arbitration agreements are enforced, as any other contract, according to their terms. *See Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1192 (2024) ("Given that arbitration agreements are simply contracts, '[t]he first principle that underscores all of our arbitration decisions' is that '[a]rbitration is strictly a matter of consent.'") (quoting *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019)). And second, federal courts interpret arbitration agreements to effectuate the Federal Arbitration Act's goals of "speed and simplicity and inexpensiveness." *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 509 (2018); *see also Lamps Plus*, 587 U.S. at 185 (explaining that neither silence nor ambiguity in arbitration terms provide "a sufficient basis to conclude that parties to an arbitration agreement agreed to 'sacrifice[ ] the principal advantage of arbitration'" (quoting *Concepcion*, 563 U.S. at 348)); *Concepcion*, 563 U.S. at 348 (disfavoring class arbitration because it "sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment").

Both principles support denying American Express's motion to compel arbitration in this case. First, a party that refuses to comply with the rules of arbitration, including the arbitration provider's assessment of fees required to initiate the proceedings, has breached its contractual duty and is no longer entitled to the benefit of its previous bargain. The alternative of overruling the arbitrator's fee determination and sending the parties back to arbitration would essentially reward the failure of the delinquent party to comply with its own agreement and put arbitration clauses on lesser footing than normal contractual clauses that allow no such unilateral escape hatch.

Second, allowing a delinquent party that lost its fee arguments before the arbitrator to relitigate the same failed arguments over arbitration fees in court, all in the hopes of forcing the parties *back* into arbitration, would undercut the Federal Arbitration Act's goals of quickly,

inexpensively, and informally resolving disputes. Such a process would instead layer yet more proceedings, costs, and rules onto an otherwise clearcut and final arbitration decision.

## II. ARGUMENT

### A. Arbitration Agreements Contractually Bind the Parties to Follow Arbitration's Procedural Rules, Including the Provider's Fee Requirements

Pre-dispute arbitration agreements let parties agree in advance to forego their right to litigate claims in court and instead voluntarily submit to the authority of an arbitrator. This pre-dispute forum selection necessarily means agreeing to accept the procedural rules and determinations of the arbitral forum, if and when a dispute actually arises. An arbitration provider's assessment of case-initiation fees on the parties is one of these binding procedural determinations to which the parties agree in advance, at the time of contract formation. Once a binding arbitration agreement is in effect, it is like any other contract, and the parties must comply with its terms or else waive their contractual rights. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 412 (2022) ("[A] court must hold a party to its arbitration contract just as the court would to any other kind."); § 20:24. Breach Excuses Performance, 28A N.Y. PRAC., CONTRACT LAW § 20:24 ("A party in breach of its contractual obligations may not thereafter seek to enforce the contract for its own advantage.").

An accepted and oftentimes express component of pre-dispute arbitration clauses is the agreement to pay the arbitrator's required fees. The arbitration clause in this case contains such an express fee arrangement. ECF 21-2 § 13.1(ix) (stipulating that a merchant "will be responsible for paying . . . only up to the amount of the filing fees Merchant would have incurred if Merchant had brought a Claim in court" and that "American Express will be responsible for any additional arbitration fees").

There is nothing untoward or suspect about the powerful party that drafted the arbitration clause shouldering a larger portion of the fees in claims asserted against it. Indeed, numerous courts have held that imposing overly high up-front fees on *non-drafting* parties would impermissibly preclude them from asserting otherwise valid claims. *See*, *e.g.*, *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1484 (D.C. Cir. 1997) (holding that an employer could not force a former employee to shoulder arbitration fees that could be much higher than court fees); *Torrance v. Aames Funding Corp.*, 242 F. Supp. 2d 862, 874 (D. Or. 2002) (holding, in consumer arbitration, that even the "best case scenario" under the existing AAA rules where the consumer would be obligated to pay up to $375 for the arbitrator's fee was "sufficient to render the obligation unconscionable" as denying the consumer a "meaningful opportunity to vindicate his or her substantive rights due to prohibitive arbitration costs").

This division of fees makes sense both legally and intuitively: not only are the large companies likely better able to pay higher fees than individual small claimants, but they are also generally the drafters of the take-it-or-leave-it arbitration clauses at issue. *See* Norman W. Spaulding, *The Ideal and the Actual in Procedural Due Process*, 48 HASTINGS CONST. L.Q. 261, 282 (2021) (describing "the powerful companies that draft arbitration clauses into their contracts"). And companies have themselves pointed to these seemingly equitable fee arrangements in successful efforts to obtain judicial enforcement of arbitration clauses. *See, e.g.*, *Concepcion*, 563 U.S. at 337 (finding enforceable arbitration agreement that "specifie[d] that [the company] must pay all costs for nonfrivolous claims," among other seemingly pro-consumer terms).

Moreover, if a drafting company ever wanted to avoid arbitration and its attendant fees, it could do so by choosing not to insert arbitration clauses into its contracts in the first place. Or if the company did not like a specific provider's fee regime, it could specify a different arbitration

provider in the arbitration clause. But these strategic decisions regarding costs must be made before, not after, the contract is formed and becomes binding on both parties to the agreement. Once the arbitration contract is in effect, the parties are bound by its terms.

**B. Failure to Pay Required Fees Amounts to Default and a Waiver**

Arbitrators are supposed to be neutral decisionmakers, which means they may at times render decisions unfavorable to the defendant-companies that themselves imposed the pre-dispute arbitration requirement. Disagreement with an arbitrator's decision, though, is no excuse for a company's failure to comply. Instead, whether the arbitration provider's decision means allowing mass-arbitration claims to proceed or, as here, interpreting the provider's own fee structures in a way that requires fee payments higher than the defendant-company would prefer, noncompliance with the arbitrator's order amounts to a default and waiver, as many courts have already held. *See, e.g.*, *Pre-Paid Legal Servs., Inc. v. Cahill*, 786 F.3d 1287, 1294 (10th Cir. 2015) ("[A] party's failure to pay its share of arbitration fees breaches the arbitration agreement and precludes any subsequent attempt by that party to enforce that agreement."); *Mason v. Coastal Credit, LLC*, No. 3:18-CV-835-J-39MCR, 2018 WL 6620684, at *8 (M.D. Fla. Nov. 16, 2018) (denying motion to compel arbitration because defendant-company "waived its right to arbitrate" by refusing to pay arbitration fees in previous arbitration proceedings that led to administrative closure); *Stanley v. A Better Way Wholesale Autos, Inc.*, No. 3:17-CV-01215-MPS, 2018 WL 3872156, at *7 (D. Conn. Aug. 15, 2018) (finding that a company waived its right to arbitrate by its "repeated failures to respond to the AAA or pay the required fees, followed by its opportunistic reversal after the AAA's decision to terminate the dispute and its current attempt to force [the claimant] to arbitration before a different body"); *Stowell v. Toll Bros*, No. 06 CV 2103, 2007 WL 30316, at *1 (E.D. Pa. Jan. 4, 2007) (holding that "[d]efendant's admission that the filing fee was not paid is sufficient for the

court to conclude that Defendant defaulted" and that "Defendant has waived its right to compel arbitration").

Comparing arbitration to a public dispute-resolution forum, civil litigation in federal court, illustrates why failure to comply with an arbitrator's determination of fee requirements is a default. If a defendant in court fails to make its required initial response, courts are empowered to enter default judgment in the plaintiff's favor. *See* Fed. R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."); Fed. R. Civ. P. 55(b)(1) ("If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing."). A defendant sued in court must respond in substance to the claims against it, but the defendant is not required to fund the dispute resolution process for the simple reason that taxpayers—not litigants—fund judicial salaries and the court system. *See* James E. Pfander, *Judicial Compensation and the Definition of Judicial Power in the Early Republic*, 107 MICH. L. REV. 1, 19 (2008) (describing "[Founding-era] statutes reflect[ing] a decision by Congress to specify fixed . . . salaries for federal judges and to deny the judges any kind of fee-based compensation for their services").

In arbitration, defendants must also respond to claims against them. Unlike court, though, the required first response is the defendant's payment of fees to initiate the proceedings. This is because arbitration, as a privatized alternative to the courts, is by definition not funded by the general public. *See* Am. Arb. Ass'n, *Commercial Arbitration Rules* ("Commercial Rules"), R-55, ("As a not-for-profit organization, the AAA shall prescribe administrative fees to compensate it for the cost of providing administrative services."). In lieu of taxpayer funding, then, arbitration

providers like the AAA require parties to pay the costs of arbitrating, which may be determined either by the AAA or by contract between the parties. *Id*; *see also* ECF 21-2 § 13.1(ix) (Amex arbitration clause stipulating fee arrangement between the parties). Only when the required up-front fees are satisfied in full does the arbitration begin. *See* Commercial Rules, R-59 ("If arbitrator compensation or expenses or the AAA's administrative fees have not been paid in full, the AAA may so inform the parties so that one of them may advance the required payment.").

And because arbitration providers are private actors lacking the government's coercive powers, providers like the AAA cannot force an unwilling party to pay its required upfront fees. Instead, the AAA's fee-collection process operates as a burden-shifting framework.

First, the AAA requires payment from the claimant. Commercial Rules, R-4(a) ("Arbitration under an arbitration provision in a contract shall be initiated by the initiating party ('claimant') filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of the applicable arbitration agreement from the parties' contract which provides for arbitration."). If the claimant refuses to pay its share of the fees, the arbitrator won't accept the case. *Id.* at R-4(a)(ii)(b). Once the claimant satisfies its filing obligations, including any fees determined by the AAA, then the burden shifts to the respondent, the defendant-company, to pay its own share of the fees. *See* Pfeffer-Gillett, *Unfair by Default*, 171 U. Pa. L. Rev. at 465 ("[O]nce the plaintiff pays the initial arbitration fee, the burden shifts to the defendant-company to pay the remaining upfront fees …"); ECF 21-2 § 13.1(ix) (Amex arbitration clause stipulating that Amex will pay the remaining arbitration fees once the merchant has paid its share). The burden to pay these fees is the defendant-company's first required response to the claims against it. And the company's failure to respond, then, is a default, just as it would be if the company failed to respond to claims against it in court.

That the AAA may, in response to a company's refusal to pay fees, seek payment from the opposing side, the party bringing the claims, does not absolve the company of its failure to respond. *See* ECF 21-24 (AAA letter noting that "Claimants have the option to advance any fees on behalf of Respondents and seek recovery from an arbitrator or arbitrators"). Instead, this approach merely illustrates the nature of private dispute resolution: Because the AAA as a private entity cannot force an unwilling company to pay its share of the fees, the arbitration reaches an impasse. And the refusal of a company like Amex to pay its contractually required share of the fees effectively shifts the burden back to the claimant-merchant to front those fees on the company's behalf (even though those fees ultimately remain the responsibility of the company and not the merchant). In other words, claimants—individual consumers, employees, and small businesses—could only proceed in arbitration by fronting the fees owed by the large corporation that itself drafted and imposed the arbitration agreement in the first place. Otherwise, the AAA would suspend and terminate the proceedings. *See* Commercial Rules, R-59(f) ("If the arbitration has been suspended by either the AAA or the arbitrator and the parties have failed to make the full deposits requested within the time provided after the suspension, the arbitrator, or the AAA if an arbitrator has not been appointed, may terminate the proceedings.").

When the AAA closes a case for non-payment under these circumstances, the upshot is that the company's failure to respond to the claim against it (through its refusal to pay the initial fees) has thwarted getting to the merits in the arbitration proceedings, just as a defendant's failure to respond to a complaint thwarts getting to the merits in court. By failing to pay its required share of the arbitration fees, then, the company being sued has defaulted on its agreement to arbitrate and has therefore waived its right to invoke the arbitration clause. *Brown v. Dillard's, Inc.*, 430

F.3d 1004, 1011 (9th Cir. 2005) (explaining that a party's failure to pay fees is a "breach," which is "tantamount to a repudiation of the arbitration agreement").

Absent court intervention, the closure of arbitration would operate in favor of the company refusing to pay its fees, at least in the short term: the arbitration proceedings would end without any finding of liability against the company (and without any findings at all, in fact, since the proceedings would be over before they even began). In my scholarship, I have termed this outcome arbitration's "Reverse Default Judgment Rule" because, absent court enforcement of arbitration rules, the system rewards rather than punishes a party's refusal to participate in proceedings against it. *See generally* Pfeffer-Gillett, *Unfair by Default*, 171 U. Pa. L. Rev. 459.

But closure of arbitration proceedings is not a reward for the company and does not absolve the company of its responsibility to pay the required fees. It is instead simply the most that an arbitration provider can do within the proceedings when a company refuses to defend itself according to the forum rules. Closure does not let the *company* off the hook from having to pay its fees; it lets the *claimant* off the hook from being forced to arbitrate. Were a delinquent company able to simply re-invoke the arbitration clause after closure of arbitration, it could keep the opposing merchant's claims in perpetual limbo by compelling arbitration; refusing to pay the arbitrator's fees; and then compelling arbitration again, with no guarantee that, after a judge grants the subsequent motion to compel, the company would not come right back to court and seek to reboot the process yet again the next time an arbitrator issues an unfavorable fee determination. This stalling tactic would allow defendant-companies to shuttle back and forth, between arbitration and court, until the opposing party gives up or runs out of money. Absent court enforcement, then, the result would be a system where "binding" arbitration is only truly binding on the consumers, employees, and small merchants upon whom arbitration was imposed, but not on defendant-

companies who drafted the agreements yet could opt out any time the proceedings don't go their way.

This is precisely where court-enforced waiver comes in. The FAA expressly provides that a court may only stay litigation and grant a motion to compel arbitration if "the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. When the party is in default, including by waiving its right to arbitrate based on failure to pay fees required to arbitrate the claims, courts therefore properly reject that party's motion to compel. *See Sink v. Aden Enterprises, Inc.*, 352 F.3d 1197, 1201 (9th Cir. 2003) (rejecting contention that FAA requires compelling arbitration after defendant-company's failure to pay, because the company "could then default a second time, and the prejudiced party's sole remedy, again, would be another order compelling arbitration," a "cycle" that "could continue, resulting in frustration of the aggrieved party's attempts to resolve its claims"); *Mason*, 2018 WL 6620684, at *8 (denying motion to compel where defendant-company failed to pay fees in previous arbitration proceedings); *see also Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 14 (1st Cir. 2005) (adhering to "the traditional rule that waiver by conduct, at least where due to litigation-related activity, is presumptively an issue for the court").

With Amex having waived its ability to seek a stay of the proceedings and order compelling arbitration, the merchants in this case are free to bring their claims in court and to do so under the Federal Rules of Civil Procedure, which allow class consolidation of claims. *See* Fed. R. Civ. P. 23. This application of the normal rules of civil procedure is consistent with the Federal Arbitration Act, which "makes clear that courts are not to create arbitration-specific procedural rules" and should instead "apply the usual federal procedural rules." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022).

### C. Finding Waiver and Denying a Delinquent Party's Motion to Compel Arbitration is Consistent with the Federal Rules of Civil Procedure and the Federal Arbitration Act

A company that causes closure of arbitration proceedings through its own refusal to pay the arbitration fees is not entitled to a court-ordered re-do of the arbitrator's fee determinations, as Amex is seeking in this case. Granting Amex's wish would fly in the face of the goal of civil litigation to "to secure the just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1. And it would also obliterate the core reason for arbitration's existence, to promote "informal" and "speedy" resolution of disputes while avoiding the "procedural morass" of going to court. *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 238–39 (2013); *AT&T Mobility v. Concepcion*, 563 U.S. 333, 348 (2011).

As for speed, to allow defendant-companies to re-write the rules of their own contracts by simply refusing to pay required fees would significantly slow down the dispute-resolution process. Unlike judges administering the traditional default-judgment rule, arbitration providers left to their own devices would be unable to compel payment of fees and have no way to ensure compliance with schedules. *See Anilina Fabrique de Colorants v. Aakash Chems. & Dyestuffs, Inc.*, 856 F.2d 873, 882 (7th Cir. 1988) (Posner, J., dissenting) ("The threat of default is one of the district judges' most important tools for obtaining compliance with litigation schedules."). As a result, defendant-companies would be incentivized to refuse arbitrators' fee determinations so that the claims against them would "bounce[] back and forth between tribunals without making any progress." *Marie*, 402 F.3d at 14. This ping-ponging between forums would substantially slow down the dispute-resolution process and utterly negate the FAA's goal of speedy resolution of claims. *See id.* at 13–14 (explaining that "sending waiver claims to the arbitrator would be exceptionally inefficient"

because "[t]he case would have bounced back and forth between tribunals without making any progress.").

Finding waiver here also supports arbitration's procedural informality. Companies, and Amex in particular, have long extolled mandatory arbitration as a device for avoiding the "procedural morass" of court. *See Italian Colors*, 570 U.S. at 238; *Concepcion*, 563 U.S. at 348. But this procedural benefit is only realized if companies actually comply with the terms of their own arbitration agreements. If a company can instead go to court any time it disagrees with an arbitrator's fee assessments or other rulings, the result is far greater procedural morass. *See Concepcion*, 563 U.S. at 348.

And this wrangling over a threshold procedural step—fee payments—imposes additional rules with which the parties must comply and forces the parties to litigate in two forums, court and arbitration, with two sets of overlapping and potentially even conflicting procedures, all before even reaching the merits of the claim itself. Arbitration is supposed to be more efficient than court, but this pre-merits process concerning fees is significantly *less* efficient than simply going to court in the first place. Rather than going to court and staying there, the parties to a commercial dispute would be forced to bounce back and forth between two forums with two sets of potentially conflicting rules to follow and potentially duplicative briefing and arguments. *See, e.g.*, *Mason*, 2018 WL 6620684, at *1–4 (detailing a consumer's year-long struggle, going from court to arbitration and then back to court, just to resolve a threshold arbitration fee-payment issue).

Along with its increased speed and informality, arbitration must also be fair to *all* parties and produce legitimate outcomes. *Concepcion*, 563 U.S. at 348–51 (describing "amount of process" required for binding parties to an arbitration award and noting that arbitration agreements must be "consensual"); *see also Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90

(2000) (noting that "large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum"). Procedural fairness and the application of neutral contract principles favors finding waiver when, as here, a defendant-company refuses to participate in its own elected arbitration procedure.

As discussed above, the nature of privatized arbitration means that aggrieved parties bound by arbitration clauses have no choice but to pay their required fees, because failure to pay those capped fees would mean abandoning the claims altogether: non-paying claimants cannot proceed in arbitration, having failed to satisfy their fees, and also cannot proceed in court, remaining bound by the arbitration clause. By contrast, allowing companies to shirk their own fee responsibilities would give them an unfair advantage of being able to pick and choose when to arbitrate and when to go to court, precisely what binding arbitration clauses and the FAA forbid. Indeed, because arbitration is a creature of contract and consent, a mutually binding arbitration agreement cannot be allowed to bind only in one direction. The unfairness of such non-mutuality is compounded when the delinquent party is the company who drafted and imposed the binding arbitration clause in the first place, and it is further compounded if the company's failure to pay could shift an undue and significant financial burden onto a merchant to cover its outstanding balance. *See Green Tree*, 531 U.S. at 90.

Allowing companies to relitigate final arbitration fee decisions until they get their way would create a double standard in which only individual claimants are truly bound to play by the rules in arbitration, and it would undermine the FAA's entire purpose of resolving disputes quickly and informally.

## III. CONCLUSION

Wherefore, amicus respectfully submits that consistent with the Federal Rules of Civil Procedure and the Federal Arbitration Act, this Court should deny Amex's motion to compel arbitration.

Respectfully submitted by:

July 10, 2024

/s/ Natalia Friedlander
Natalia Friedlander (#10003)
127 Wall St.
New Haven, CT 06511
(203) 432-3928
natalia.friedlander@yale.edu

*Attorney for Alexi Pfeffer-Gillett*