# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| 5-STAR GENERAL STORE aka BENTO LLC, MARC ALLEN, INC., FAST FORWARD MEDIA, INC., MEZE LLC, KENNEDY'S IRISH PUB INC., CARDEN, INC., FRENCH FLORIST, LLC, LUXE FURNITURE, INC., LUNA'S HOSPITALITY GROUP, LLC, and THE GENT'S PLACE MEN'S FINE GROOMING LLC on behalf of themselves and others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) |  |
|  | ) | C.A. No. 24-cv-106-MSM-LDA |
| Plaintiffs, | ) ) |  |
| v. | ) ) ) |  |
| AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES CO. INC., | ) ) ) ) |  |
| Defendants. | ) ) |  |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

These motions revolve around an ironic dilemma: a credit card company not paying its bills. After the American Arbitration Association ("AAA") found that American Express ("Amex") owed more than $17,000,000 in filing fees related to arbitrations with 5-Star General Store and 5,154 other merchants ("Merchants"), Amex refused to pay. The AAA then "administratively closed" the case, and the Merchants filed suit in this Court.

Amex now moves to stay the litigation and compel further arbitration; alternatively, it moves to strike the class allegations from the Merchants' Complaint. (ECF No. 18–19.)  To decide these motions, the Court must first determine whether Amex's failure to pay the filing fees put it in "default" under 9 U.S.C. § 3, one relevant part of the Federal Arbitration Act.  Because the Court finds that Amex is in default, its Motion to Compel Arbitration (ECF No. 18) is DENIED.  Next, the Court must determine whether it will take the drastic step of deleting the Merchants' class allegations so early in the litigation.  It declines to do therefore Amex's Motion to Strike Class Allegations (ECF No. 19) is DENIED.

## I.    BACKGROUND

5-Star General Store is a convenience store on Main Street in Pawtucket, Rhode Island.  (ECF No. 1 ¶ 19.)  It accepts all major credit cards, including American Express.  *Id.*  When 5-Star General Store agreed to accept Amex cards, it agreed to follow Amex's non-discrimination provisions ("NDPs"), a part of the company's Merchant Operating Guide.  *Id.* ¶ 31.  The NDPs limit 5-Star General Store—as well as all other merchants that accept Amex—in a few notable ways: for instance, the store cannot "state a preference for any other credit card," "reveal to its customers the cost it incurs to accept transactions on Amex," "offer the customer a discount in exchange for using a different credit card," or impose various surcharges on Amex transactions.  *Id.* ¶ 32.

Another part of the Merchant Operating Guide is an agreement to arbitrate disputes with Amex, rather than litigate them.  (ECF No. 18-3 ¶ 3.)  So, when 5-Star

General Store and thousands of other merchants wanted to challenge the legality of these NDPs under federal antitrust laws, they started in arbitration. (ECF No. 18-2 at 2.)

But things did not get very far. Disputes soon arose about who should foot which part of the AAA's bill. This Court does not referee arbitration disagreements, so it need not recount anything but the final order. On January 18, 2024, the AAA found that the Merchants owed $350 per claim and Amex owed $3,150 per claim on over 5,000 claims. (ECF No. 18-19 at 2.) Frustrated by the decision, Amex repeatedly protested it. (ECF No. 18-20; ECF No. 18-21.) While it remained "willing to pay its share of $925 for each claim," what Amex saw as the right price, it described the AAA's final bill as a "dramatic reversal" from previous statements the AAA had made. (ECF No. 18-20 at 2.) Amex thus did not pay, despite warnings from the AAA about consequences for not doing so. And because the AAA "did not receive payment" by the stated deadline, it "administratively closed" 5,155 claims "for non-payment." (ECF No. 18-22 at 2.)

That led to the current litigation. Following the close of arbitration, 5-Star General Store brought this federal antitrust suit on behalf of the "5,155 merchants" against whom they allege "Amex has waived the right to compel arbitration." (ECF No. 1 ¶ 62.) Amex moves to stay the litigation and compel (more) arbitration against the Merchants. (ECF No. 18.) It alternatively moves to strike the Merchants' class allegations from their Complaint. (ECF No. 19.)

## II.    LEGAL STANDARD

### A.  Motion to Compel Arbitration

If the parties have a valid arbitration agreement—which is not in dispute here—the Federal Arbitration Act ("FAA")requires the Court, upon a party's motion, to stay any litigation until arbitration "has been had in accordance with the terms of the agreement," as long as the moving party "is not in default in proceeding with such arbitration."  9 U.S.C. § 3.  If there are no problems under § 3, the Court must also compel arbitration under § 4 upon the party's motion.

### B.  Motion to Strike Class Allegations

This Court has authority under Fed. R. Civ. P. 12(f) to delete a complaint's class allegations only "if it is obvious from the pleadings that the proceeding cannot possibly move forward on a classwide basis." *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 59 (1st Cir. 2013).  Rule 23(d)(1)(D) similarly permits courts to remove a complaint's class allegations "once it becomes clear that the plaintiffs cannot possibly prove the deleted portion of those claims," at least "where the basis for the motion to strike is distinct from the factors the court would consider on a motion for class certification." *Monteferrante v. Williams-Sonoma, Inc.*, 241 F. Supp. 3d 264, 269 (D. Mass. 2017) (cleaned up).

## III.    DISCUSSION

### A.    Motion to Compel Arbitration

Amex makes three main arguments for compelling arbitration.  First, it contends that questions about default should be left to the arbitrator.  (ECF No. 18

at 10–12.)  Next, it asserts that even if the Court can decide these questions, Amex's failure to pay the AAA fees did not constitute default or wholesale waiver of the right to arbitrate.  *Id.* at 12–16.  Finally, it argues that other problems—particularly that the Merchants have "unclean hands" and that they improperly changed their theory of the case between arbitration and litigation—foreclose litigation.  *Id.* at 16–20.  The Court addresses these arguments in turn.

### 1. Who decides whether a party is in "default" and whether arbitration "has been had" under 9 U.S.C. § 3?

As long as the parties have a valid arbitration agreement, the FAA requires the Court to stay any litigation upon a party's motion and compel arbitration until "arbitration has been had in accordance with the terms of the agreement," provided that the moving party "is not in default in proceeding with such arbitration."  9 U.S.C. §§ 3–4.  There are two main questions baked into § 3: when has arbitration "been had" and when is a party "in default"?

In *Marie v. Allied Home Mortgage Corp.*, the First Circuit explained that these are typically questions for a judge.  402 F.3d 1, 14 (1st Cir. 2005).  The statute "seem[ed] to place a statutory command on courts, in cases where a stay is sought, to decide" questions about default and waiver "themselves."  *Id.*  And although "the same language does not appear in Section 4, the section dealing with attempts to compel arbitration," the *Marie* court explained "that the Supreme Court has cautioned us to interpret sections 3 and 4 of the FAA together."  *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04 (1967)).

*Marie* did not expressly hold that a judge can decide that a party waived its right to arbitrate by not paying its filing fees, thus sending the party into "default" under the statute. But other circuits have faced that question head-on, and they have all reached the same conclusion: judges, not arbitrators, should decide. *See, e.g., Pre-Paid Legal Servs. v. Cahill*, 786 F.3d 1287, 1298 (10th Cir. 2015) ("We hold in the circumstances of this case [failure to pay fees] that the absence of a formal finding of default by the arbitrators does not preclude the district court from making that determination under § 3."); *Hernandez v. Acosta Tractors, Inc.*, 898 F.3d 1301, 1305 (11th Cir. 2018) ("Once Acosta defaulted in the arbitration, the District Court would have been within its power to find that Acosta could no longer require Mr. Hernandez to proceed in arbitration."); *Sink v. Aden Enter., Inc.*, 352 F.3d 1197, 1200 (9th Cir. 2003) ("Aden's attempt to compel arbitration for a second time stumbles over § 3 of the FAA, which provides that before granting a stay of proceedings pending arbitration a court must determine that … 'the applicant for the stay is not in default in proceeding with such arbitration.'"); *Noble Cap. Fund Mgmt., LLC, v. U.S. Cap. Glob. Inv. Mgmt. Fund*, 31 F.4th 333, 336 (5th Cir. 2022) (same).

Amex relies primarily on *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002), and *Boateng v. General Dynamics Corp.*, 473 F. Supp. 2d 241 (D. Mass. 2007), to argue otherwise, but its efforts are unconvincing. The Court in *Howsam* stated that "procedural questions which grow out of the [arbitration] and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide," and "so, too, the presumption is that the arbitrator should decide allegation[s] of waiver,

6

delay, or a like defense to arbitrability." *Id.* at 85. But in *Marie*, the First Circuit explicitly held "that the Supreme Court in *Howsam* … did not intend to disturb the traditional rule that waiver by conduct, at least where due to litigation-related activity, is presumptively an issue for the court." 402 F.3d at 14. The court provided many reasons why, including the FAA's text, the Revised Uniform Arbitration Act of 2000, the "comparative expertise considerations" involved, and general concerns about efficiency. *Id.* at 13–14. Although it is not certain that failure to pay arbitration fees is a "litigation-related activity" as *Marie* conceived it, all those considerations remain relevant here. And *Marie*'s holding extends "at least" to "litigation-related activity," meaning there is room for it to extend further, particularly when the moving party's conduct directly implicates the statute's command that the Court cannot grant a stay when the moving party is in "default." *Id.* at 14. The Tenth Circuit in *Cahill* drove the point home. On this question,

> *Howsam* is distinguishable. It dealt with an NASD rule about time limits, not default under § 3 of the FAA. The time limit [in *Howsam*] was part of the arbitrator's own rules and not contained in a federal statute like § 3. Indeed, the Court in *Howsam* noted that NASD arbitrators, as compared to judges, are 'comparatively more expert about the meaning of their own rule, [and] are comparatively better able to interpret and to apply it.' The same cannot be said, however, of the meaning of 'default' in a federal statute; the parties 'would likely have expected a court to have decided [this] gateway matter.'

786 F.3d at 1295 (cleaned up).

*Boateng* is also readily distinguishable. Unlike *Cahill*, *Boateng* did not involve filing fees; the question was whether an employer's application of internal policies meant that it waived its right to arbitrate a discrimination dispute with an employee. 473 F. Supp. 2d at 249. The plaintiff contended "that her 2005 meetings with [the

company's] Human Resources Manager and its Ethics Director qualified as Level 1 of the dispute resolution process (Human Resources Review)," that she "effectively invoked the Policy," that the employer's "failure to provide her with written notice of a 'Final Determination of the Human Resources Review' constitute[d] a material breach of the policy," and thus that the company waived its right to arbitration.  *Id.* The court sent that question to the arbitrator, noting factual similarities to *Howsam* and explaining that the waiver inquiry turned on searching "questions of fact" and "contract interpretation" that arbitrators were "well-suited to answer."  *Id.* at 251.

But the question here is different: whether Amex's conduct that caused arbitration to be closed, particularly its failure to pay fees, amounts to "default" in the proceeding under § 3 of the FAA.  That involves statutory interpretation more than contract interpretation, and it is a job fit for, and congressionally delegated to, a judge.  *See, e.g.*, *Marie*, 402 F.3d 14 n.10 ("The 'default' language in Section 3 of the FAA, which as we noted includes waiver, perhaps gives courts a duty, which cannot be shifted by contract between the parties, to determine whether waiver has occurred.").

Here, returning the question to the AAA would be redundant.  Even though the AAA did not explicitly state that Amex was in default, it closed the cases following Amex's nonpayment.  (ECF No. 18-22 at 2.)  Courts have found that an arbitrator's closure of a case for nonpayment effectively functioned as an arbitrator's finding that the party is in default.  *See Cahill*, 786 F.3d at (explaining that "the arbitrators in this case" found that Cahill was in default because they "first suspended and then

terminated the proceedings and closed the case" following Cahill's failure to pay fees, even without a formal finding of default); *Rapaport v. Soffer*, 2:10-cv-00935-KJD-RJJ, 2011 WL 1827147, at *2 (D. Nev. May 12, 2011) (noting that although the AAA had not "formally entered an order of default" against a party, its termination of the arbitration for failure to pay constituted a finding of default, and the "[l]ack of a formal ruling of default from the arbitrator does not change this reality").

Accordingly, the Court holds that it must decide questions arising under 9 U.S.C. § 3 related to Amex's failure to pay its filing fees.

### 2.    Are the requirements of 9 U.S.C. § 3 satisfied?

The Court cannot grant the requested stay and compel arbitration if arbitration has already "been had" or if the moving party is "in default with such proceeding." 9 U.S.C. § 3. Although § 3 only relates to staying litigation, it is closely bound to § 4, which addresses compelling arbitration. As the Ninth Circuit explained, it does not make sense "that a district court is required to enter an order under § 4 compelling parties to return to arbitration under circumstances where § 3 precludes the district court from staying its own proceeding." *Sink*, 352 F.3d at 1200. "Such an interpretation of § 4 would interfere with the manifest intent of Congress, as expressed in § 3, that arbitration is to be furthered where a party has not defaulted in arbitration, and would lead to duplicative and potentially inconsistent decisions if an arbitral forum and a court action were to proceed at the same time on the same claim." *Id.* at 1201. The result is that Amex's Motion to Compel Arbitration under § 4 rises and falls with the Court's determination of questions arising under § 3.

The Court starts with whether Amex is "in default in proceeding with such arbitration." 9 U.S.C. § 3. Where, as here, Congress has not defined what it means for a party to be in "default," we "consult dictionary definitions, interpretations given to the same terms by judicial construction, and the statutory context in which the words are used." *Hernandez-Miranda v. Empresas Diaz Mas*so*, Inc.*, 651 F.3d 167, 171 (1st Cir. 2011).

*Black's Law Dictionary* defines "default" as "the omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due." *Default*, *Black's Law Dictionary* (12th ed. 2024). In that respect, this issue is clear. Amex had a contractual duty to abide by AAA rules, including rules about fees. *See* American Express Merchant Operating Guide, ECF No. 18-6 at 122 ("Claims will be resolved pursuant to this Arbitration provision and the selected organization's rules in effect when the Claim is filed."). In not paying the fees by the AAA's stated deadline, Amex failed "to pay a debt when due." *See* ECF No. 18-22 at 2 ("As to the remaining 5,155 claims, in accordance with our previous correspondence, because we did not receive payment by the previously communicated deadline, these cases are administratively closed for non-payment.")). Amex is plainly in "default."

Amex insists that the analysis is more complex: that "default" must be treated like "waiver," and that there is a "demanding" standard to finding "waiver." (ECF No. 26 at 14–15.) Nothing in the FAA itself suggests that is correct, especially when "default" by its ordinary meaning has occurred. Still, the First Circuit has recognized that the term "default" in § 3 has "generally been viewed" to include "waiver" in its

reach. *See Marie*, 402 F.3d at 13. That makes little difference here though, because a separate "waiver" analysis leads to the same result. Waiver is, as the Supreme Court has repeatedly stated, "the intentional relinquishment or abandonment of a known right." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). The deliberate choice not to pay arbitration fees after repeated warnings from the arbitrator about impending closure clearly constitutes waiver.

This result neatly tracks the national caselaw. *See, e.g.*, *Cahill*, 786 F.3d at 1294 ("By refusing multiple requests to pay, he allowed arbitration to terminate. Failure to pay arbitration fees constitutes a 'default' under § 3."); *Sink*, 352 F.3d at 1199–1200 (same); *Garcia v. Mason Cont. Prod., LLC*, 2010 WL 3259922, at *4 (S.D. Fla. Aug. 18, 2010) ("The AAA provided repeated notices to the Defendant that timely payment of the fee had not been received. ... There is no other description the Court can find for this self-created situation other than 'default.'").

Amex repeatedly claims that its circumstances are different from the cases described above. For instance, it suggests that because it is arbitrating similar claims, it is absolved of its failure to pay fees for these claims. It also notes that, to resolve the dispute, the Merchants "can agree to proceed on the basis of the originally determined $925 per claim filing fee, or advance the additional portion of a $3,500 per claim filing that fee that *they* insist applies." (ECF No. 18 at 22) (emphasis in original). The upshot is that, unlike non-paying parties in other cases, Amex

11

"remains ready" and "willing" to arbitrate after paying the share of fees that it believes is due. *See, e.g.*, ECF No. 18 at 6, 8, 14, and 20. Or so it says.

The Court disagrees. First, the fact that Amex is arbitrating similar disputes does not bear on whether it is in default for these claims. Second, it is not just the Merchants that "insist" the higher fee applies; the AAA—one of two arbitration organizations that Amex selected for its own Merchant Operating Guide—decided that the higher fee applies. (ECF No. 18-19 at 2.) And finally, when Amex disagreed with the AAA's decision, it just took its ball and went home. (ECF No. 18-22 at 2.) Amex clearly is not "ready" and "willing" to arbitrate on anyone's terms but its own, and that is not how the arbitration system works. Its behavior is wholly "inconsistent with a right to arbitrate." *Marie*, 402 F.3d at 14.

The differences between arbitration and litigation highlight why. "When a defendant in a judicial forum refuses to respond to a complaint that is properly filed and served, the court has the power to enter and enforce a default judgment." *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1013 (9th Cir. 2005). But "arbitration works differently." *Id.* "The American Arbitration Association could not compel" Amex "to pay its share of the filing fee, and in the absence of the fee it could not proceed." *Id.* To continue their case, the Merchants "had no choice but to come to court," or—as Amex suggested—foot Amex's $17,000,000 bill. *Id.*; ECF No. 18 at 22.

And as amicus Professor Pfeffer-Gillett explained, letting Amex "simply re-invoke the arbitration clause after closure of arbitration" could put the Merchants' claims "in perpetual limbo." (ECF No. 23 at 16.) Once the parties are back at the

AAA, there is nothing stopping Amex from refusing to pay the fees (again), and then the parties would end up in court (again). *Id.* The Merchants would spend more and more on filing fees while Amex pays nothing; all the while, the case moves no closer to resolution. *See* Alexi Pfeffer-Gillett, *Unfair by Default: Arbitration's Reverse Default Judgment Problem*, 171 U. Pa. L. Rev. 459, 466 (2023) ("Unlike traditional court default judgment rules that punish defendants who ignore claims, arbitration's payment structure and lack of pre-payment default rules actually reward defendants for neglect and gamesmanship.").

Just as the AAA's powers are limited, so too are this Court's. For example, this Court cannot revisit the AAA's decision about the fees, force it to reopen the case on Amex's preferred terms, or compel Amex to pay the fees the AAA decided it owed. *See, e.g.*, *Wallrich v. Samsung Electronics Am., Inc.*, 106 F.4th 609, 620 (7th Cir. 2024) ("The district court exceeded its authority and scope of the arbitration agreement by ordering Samsung to pay the AAA filing fees."); *Dealer Comput. Servs., Inc. v. Old Colony Motors, Inc.*, 588 F.3d 884, 887–888 (5th Cir. 2009). If Amex remains firm about what it owes the AAA, there is no reason to think a second round of arbitration will fare any better than the first. *See Sink*, 352 F.3d at 1201 (explaining that courts should not "allow a party refusing to cooperate with arbitration to indefinitely postpone litigation" and frustrate "the aggrieved party's attempts to resolve its claims").

Amex also suggests that the "no-waiver" clause in its agreements with the Merchants requires this Court to compel arbitration. But there are two problems

with that argument.  First is that the "no-waiver" clause is not relevant to the analysis of whether Amex is in "default" under 9 U.S.C. § 3.  Default occurs when a party fails to pay a debt on time; that cannot be contracted away so easily.

And second, the circuits to consider the question seem to agree: "the presence of a 'no waiver' clause does not alter the ordinary analysis undertaken to determine if a party has waived its right to arbitration." *Johnson Assoc. Corp. v. HL Operating Corp.*, 680 F.3d 713, 717 (6th Cir. 2012) (collecting cases); *see, e.g.*, *Republic Ins. v. PAICO Receivables, LLC*, 383 F.3d 341, 348–49 (5th Cir. 2004) ("The inclusion of a 'no waiver' clause in a contract does not eliminate the district court's inherent power to control its docket.").  After all, the Supreme Court recently reiterated, "The federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan*, 596 U.S. at 418.  And in contract law, "the general view is that a party to a written contract can waive a provision of that contract by conduct despite the existence of a so-called antiwaiver or 'failure to enforce' clause in the contract." Richard A. Lord, *Williston on Contracts* § 39:36 (4th ed. 2024).  *Morgan* makes clear that the Court should treat arbitration agreements like contracts.  Therefore, the principle that a party's conduct can nullify a written no-waiver clause applies in full force to this case.  And under that principle, Amex's deliberate failure to pay its filing fees, after repeated warnings of consequences, is enough to waive its right to arbitration.

The Court thus holds that Amex was in "default" under 9 U.S.C. § 3 for its failure to pay fees for the Merchants' claims.  The finding of "default" is enough to

deny the motion to compel, so the Court need not address whether arbitration "has been had."[1]

### 3. Do the Merchants have "clean hands"?

Amex next posits that, even if it defaulted, the Merchants cannot raise that as a defense to this motion because they lack the "clean hands" necessary to do so. The Court can quickly dispense with that argument for several reasons. First, the FAA's language requires the Court to independently assure itself that, under the statute, arbitration has not "been had" and that the party seeking to compel arbitration is not in "default" before granting a motion to stay litigation and compel arbitration. 9 U.S.C. § 3. That is true whether another party, clean hands or not, makes the argument. Second, the Merchants' conduct is largely irrelevant, because it was Amex's failure to pay, not the Merchants' advocacy, that caused the default. And third, the Court has reviewed the record and finds nothing suggesting that the Merchants "transgress[ed] equitable standards of conduct" or acted in "bad faith,"

---

[1] That said, the Court notes that several circuits have held that arbitration's closure following a party's failure to pay fees means that it "has been had." *See, e.g.*, *Noble Cap. Fund Mgmt.*, 31 F.4th at 336 (holding, because "JAMS terminated the arbitration proceeding following the Fund's nonpayment" that "arbitration 'has been had'"); *Tillman v. Tillman*, 825 F.3d 1069, 1072–74 (9th Cir. 2016) (holding arbitration had "been had" where arbitration was terminated after the plaintiff did not pay her portion of the arbitration fees); *Cahill*, 786 F.3d 1287, 1293–94 (10th Cir. 2015) (affirming lift of a stay after a party failed to pay arbitration fees and the arbitrator terminated the arbitration); *Freeman v. SmartPay Leasing, LLC*, 771 F. App'x 926, 934–35 (11th Cir. 2019) (affirming lift of a stay after the party seeking to compel arbitration did not pay its JAMS filing fees and JAMS terminated the arbitration).

such that the "clean hands" doctrine applies.  *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1946).[2]

### 4.    Did the Merchants change their claims between arbitration and litigation?

Finally, Amex observes that "only prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate."  *FPE Found. v. Cohen*, 801 F.3d 25, 30 (1st Cir. 2015).  Amex argues that because the Merchants purportedly changed parts of their case between arbitration and litigation, the alleged "default" in past arbitration proceedings cannot extend to the "new" issues discussed in the Merchants' Complaint.  (ECF No. 18 at 18–20.)  More specifically, Amex asserts that the Merchants changed their case in two important ways: the basis of liability and the requested relief.

Before delving into each, it is worth clarifying the standard and determining how much change nullifies past waiver.  Courts have recognized that a defendant's "waiver of the right to compel arbitration" is not "automatically nullified" by a plaintiff's new filing.  *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1201 (11th Cir. 2011); *see also Liu v. Equifax Info Servs., LLC*, 2024 WL 308089, at *10 (D. Mass. 2024) (same).  Instead, "courts will permit the defendant to rescind his earlier waiver, and revive his right to compel arbitration, only if it is shown that the amended complaint unexpectedly changes the scope or theory of the plaintiff's claims."  *Krinsk*,

---

[2] The only questionable part of the record was Amex's reliance on its counsel's *ex parte* calls with the AAA to support its contention that its portion of the filing fee should have been smaller.  (ECF No. 18-11 at 2 n.1.)

654 F.3d at 1201; *see also Liu*, 2024 WL 308089, at *10 (applying the standard).  In other words, the prior arbitration must have been "between the same parties and involved essentially the same claim as the one" now being litigated.  *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1207 (10th Cir. 2016) (collecting cases).

The Eleventh Circuit found that the plaintiffs changed their case too much, reviving the defendants' right to arbitrate, when the plaintiffs added a "new class definition" in an amended complaint that "greatly broadened the potential scope" of the case "by opening the door to thousands—if not tens of thousands—of new class plaintiffs not contemplated in the original class definition." *Krinsk*, 654 F.3d at 1203. Similarly, the Tenth Circuit found that the right to arbitrate was not waived when the prior litigation involved different parties.  *In re Cox*, 835 F.3d at 1207 ("The difference in parties is dispositive.").[3]

On the other hand, the Seventh Circuit found that a defendant's waiver of arbitration was not rescinded—and thus litigation could continue—when an amended complaint "did not add a new cause of action, change the theory of liability, change the parties, assert new claims, or otherwise transform the litigation in any

---

[3] There are technically "different parties" in this case than in each arbitration, because the Merchants are now trying to proceed collectively even though they proceeded individually at arbitration.  But Amex did not raise that point and it is not a winner.  All these Merchants were necessarily at the arbitration, and Amex noted that class-wide litigation was "specifically prohibited by [the] arbitration agreement" that the Merchants are subject to.  (ECF No. 19 at 14 n.5 (citing Amex Merchant Operating Guide § 13.1(c))).  If it could not have happened at arbitration, Amex never had a right to arbitrate it.

way," but added detail "to existing factual allegations" and emphasized a different part of the claim using new evidence. *Burton v. Gosh*, 961 F.3d 960, 968 (7th Cir. 2020). Another district court in this Circuit found that removing "some introductory paragraphs," making "some wording and typographical changes," and most importantly, adding new "allegations regarding" the defendant's conduct did not revive the right to arbitrate. *Liu*, 2024 WL 308089, at *10. Those "relatively modest additions" did not "fundamentally change the 'scope or theory' of the plaintiff's claims" enough, because the new complaint raised "functionally the same claims as those raised in the original." *Id.*

With these benchmarks in mind, the Court first turns to liability. Amex argues that the Merchants "now assert an entirely new basis of liability, claiming they 'will show Amex has market power in the relevant market' (Compl. ¶ 44), when their arbitral Demands previously said the opposite, that 'the indirect method [of antitrust proof] and market power concepts have no relevance to this case.'" (ECF No. 18 at 25.)

To figure out whether this "unexpectedly changes" the "scope or theory" of the Merchants' case, the Court compares the AAA Demands and the Complaint. In the AAA Demands, the Merchants described theories of antitrust liability. (ECF No. 18-5 ¶ 48.) In explaining how to litigate a case under the "rule of reason," they walked through the relevant burden-shifting framework. *Id.* at 49. First, they discussed how to provide direct evidence. *Id.* ¶¶ 49–50. And in the next paragraph, they stated:

> Alternatively, where the plaintiff is unable to adduce direct evidence of harm to competition, plaintiffs may attempt to satisfy their burden under the

"indirect method" of proof, by showing the defendant possesses "market power" in a rigorously defined market and that the restraint is "likely" to cause harm. ... *But the indirect method and market power concepts have no relevance to this case*, where Claimant will present real-world "direct" evidence showing that the Amex Rules increase the two-sided price of transactions and impose extraordinary barriers to entry and expansion in the relevant market.

(ECF No. 18-5 ¶ 51) (emphasis added).[4]  Compare that to the Merchants' Complaint. There, they similarly walk through the rule of reason and the burden-shifting method.  (ECF No. 1 ¶¶ 40–43.)  After explaining both the direct and indirect methods, *id.* ¶¶ 42–43, Merchants describe the evidence they plan to bring:

Here, plaintiffs will present real-world direct evidence showing that the NDPs increase the two-sided price of transactions and impose extraordinary barriers to entry and expansion in the relevant market. ... *Additionally, plaintiffs will show that Amex has market power in the relevant market.*

(ECF No. 1 ¶ 44) (emphasis added).  Amex uses only this last sentence—and the discrepancy between it and the AAA Demands—to allege that the Merchants have asserted "an entirely new basis of liability."  (ECF No. 18 at 25.)  That is a stretch.

Consider the context.  The Merchants are litigating the case under the Sherman and Clayton Acts—the same laws from the AAA Demands—against the same party, and they are still making arguments about how Amex's practices violate the rule of reason.  This is more than "functionally" the same claim: it is the same claim.  *Cf. Liu*, 2024 WL 308089, at *10.  And the Merchants still plan to use the direct evidence method, as they stated in the initial AAA Demands.  So the "market power" sentence is hardly "an entirely new basis of liability," given that if the Merchants satisfy the "real-world direct evidence" standard, this issue will not even

---

[4] The "Claimants" referenced in excerpts from the AAA demands are now the Merchants.

be reached.  This is just one more sentence about an evidentiary theory under the same claim; "market power" is not referenced any other times in the Complaint.  This "relatively modest addition" cannot revive the right to compel arbitration.  *See, e.g.*, *Liu*, 2024 WL 308089, at *10 (rejecting a waiver argument despite new allegations when the amended complaint "nonetheless asserts the same causes of action" as the first one).

Next, the requested relief.  In the AAA Demands, the Merchants sought damages and injunctive relief.  (ECF No. 18-5 ¶¶ 56–59.)  In the Complaint, the Merchants request declaratory relief alongside an injunction.  (ECF No. 1 at 20.)  Yet the shift from damages to declaratory relief is one in form, not substance; as the Merchants explain, they seek declaratory relief in furtherance of future damages determinations.  (ECF No. 22 at 12–13.)  Because they already sought damages at the AAA, this change cannot resurrect the right to arbitrate.

Finally, the injunction.  In the AAA Demands, the Merchants asked for an injunction "as broad as necessary" to redress the injury.  (ECF No. 18-5 ¶ 59.)  They sought one that "not only allows the Claimant itself to freely steer and surcharge transactions, but that further allows Claimant's competitors in its industry and geographic area" to do the same.  *Id.*  Still, they explained that "the question of just how broad an injunction must be to deliver meaningful relief is an issue for the arbitrator." *Id.*  But in the Complaint, the Merchants phrase it differently.  They seek an injunction:

> to rescind its NDPs, to an extent to be determined at trial; to modify accordingly all iterations of the card acceptance rules that Amex publishes on

its websites, including the MOG; and to publish information sufficient to educate the general public concerning the permissible scope of credit card steering and surcharging.

(ECF No. 1 at 20.)  Amex argues that these two injunctive awards are meaningfully different and that the Complaint's requested injunction is impermissibly broader than the one in the AAA Demands.

The Court disagrees.  The Complaint can be read to provide details about how an injunction can let the Merchants and their competitors "freely steer and surcharge transactions," the relief sought in the AAA Demands.  As the Merchants observe, the AAA Demands—only two pages before the request for the injunction—did include a brief but clear discussion about the salient effects of the Amex Rules being wholly "rescinded" for the market.  (ECF No. 18-5 ¶ 46.)  This broad language in the Complaint thus should not come as a shock of surprise to Amex, and it does not "unexpectedly" change the case.  *Krinsk*, 654 F.3d at 1201

It is also not certain that the Merchants seek the nationwide injunction that Amex laments.  The Complaint says that the Merchants only seek for the NDPs to be rescinded "to an extent to be determined at trial."  (ECF No. 1 at 20.)  Further, as explained below, Amex's Merchant Operating Guide restricted the scope of the Merchants' possible claims in arbitration, too.  (ECF No. 19 at 14 n.5 (citing Amex Merchant Operating Guide § 13.1(c))).  In short, the AAA Demands sought a broad injunction under federal antitrust law, and the Complaint does too.  There are differences, but those differences do not "fundamentally change the 'scope or theory

21

of the [Merchants'] claims' to have revived" Amex's right to arbitrate. *Liu*, 2024 WL 308089, at *10 (quoting *Krinsk*, 654 F.3d at 1202).

For those reasons, the Court will deny Amex's Motion to Compel Arbitration (ECF No. 18).

### B.    Motion to Strike Class Allegations

Next, the Court considers Amex's Motion to Strike Class Allegations.  (ECF No. 19.)  To establish a class under Rule 23, the plaintiff must satisfy all the requirements of Rule 23(a) and fit into one of three categories established by Rule 23(b).  *See* Fed. R. Civ. P. 23.

Amex makes three arguments for striking the class allegations from the Complaint.  The class is not "ascertainable" under Rule 23(a), Amex first contends, because its elements, "5,155 merchants" and "as to which Amex has waived the right to arbitration," are neither "stable" nor "objective."  (ECF No. 19 at 12–16.)  Next, Amex argues that certification under Rule 23(b)(2) is inappropriate because the proposed injunction is broader than necessary to provide relief for "the class as a whole."  *Id.* At 6–10.  Finally, Amex insists that the Merchants' pursuit of declaratory relief under Rule 23(c)(4) is inapt for two reasons.  First, there is no class under Rule 23(b)(2), Amex contends, and second, damages liability cannot arise from a class certified under Rule 23(b)(2).  *Id.* At 6 n.4, 10–12.

Before addressing those arguments, the Court notes important guidance from the First Circuit: the Court "should exercise caution when striking class action allegations" at this stage of the litigation.  *Manning*, 725 F.3d at 59.  There are at

least two good reasons why.  "First, while ruling on a motion to strike is committed to the district court's sound judgment, such motions are narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion."  *Id.*  After all, "striking a portion of a pleading is a drastic remedy and … it is often sought by the movant simply as a dilatory or harassing tactic."  *Id.* (quoting 5C Charles Alan Wright, et al., *Federal Practice & Procedure* § 1380 (3d ed. 2011)).  Second, "courts have repeatedly emphasized that striking class allegations under Rule 12(f) is even more disfavored," because "it requires a reviewing court to preemptively terminate the class aspects of … litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification."  *Id.* (cleaned up).  The Court proceeds with these points in mind.

### 1.    Is the class ascertainable under Rule 23(a)?

To establish a class under Fed. R. Civ. P. 23(a), the Merchants must show that the class has four characteristics: numerosity, commonality, typicality, and adequacy.  *In re Nexium Antitrust Litig.*, 777 F.3d 9, 17 (1st Cir. 2015).  But there is another background requirement baked into Rule 23(a): the class must be ascertainable.  As the First Circuit explained, "the definition of the class must be definite," meaning its "standards must allow the class members to be ascertainable" with reference to "objective criteria."  *Id.* at 19.  In its Motion, Amex only argues that the class is not

ascertainable, so the Court limits its discussion of Rule 23(a) to that question at this stage of the litigation.[5]  (ECF No. 18 at 12.)

In its Complaint, the Merchants describe their class as consisting of "the 5,155 merchants described above, as to each of which Amex has waived the right to compel arbitration."  (ECF No. 1 ¶ 62.)  Amex splits this definition into two elements, "5,155 merchants" and "as to which Amex has waived the right to compel arbitration," and contends that neither is objective.  (ECF No. 19 at 18–20.)

Amex starts by arguing that "5,155 merchants" is not objective because it "is comparable to attaching an excel sheet or list of purported class members."  (ECF No. 19 at 13.)  Amex cites *Rivera v. Exeter Finance Corp.*, 829 F. App'x 887, 888 (10th Cir. 2020), to bolster its argument, but it misses the mark on this point.  The "list of 482 names" in *Rivera* was all that the plaintiff provided the court in an expansive class action against a robocall company, and plaintiffs' counsel winnowed down that list of 482 names from far more potential class members using "subjective criteria."  *Id.* at 887 n.1.  Plaintiffs' counsel, for instance, eliminated "names or addresses that were 'similar to the prior subscriber's name or address' and that 'reflect[ed] businesses or [had] false or inadequate name or address information.'"  *Id.* (cleaned up).  The court then had to "work backwards to determine which commonalities between the members could make it a class in order to come up with a class definition."  *Id.* at 888.

---

[5] Upon a motion for class certification, this Court will conduct "a rigorous analysis of [all] the prerequisites established by Rule 23."  *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).  But in the meantime, it only considers the arguments directly raised by Amex in its attempts to strike the allegations.

But that is not the case here.  The class is not just any "5,155 merchants," but "the 5,155 merchants" that Amex "has waived the right to compel arbitration." (ECF No. 1 ¶ 62.)  That is a full and finite group defined by Amex's conduct on a given date, so it is "administratively feasible to determine whether a particular individual is a member."  *In re Dial Complete Marketing and Sales Practices Litig.*, 312 F.R.D. 36, 48–50 (D.N.H. 2015).

That leads to Amex's second argument: the latter half of the definition is impermissible because it requires "that the class include only merchants as to whom Amex has waived the right to compel arbitration—a legal determination, not an objective fact."  (ECF No. 19 at 20.)  Amex observes that courts "routinely refuse to permit classes that are defined based on such threshold legal determinations, which are often referred to as 'fail safe' classes."  *Id.*

But this is not a fail-safe class.  As the First Circuit has explained, a "fail-safe" class is "defined in terms of the legal injury" at the core of the case's merits.  *In re Nexium*, 777 F.3d at 22; *see also Kamar v. Radio Shack Corp.*, No. 09–55674, 2010 WL 1473877, at *1 (9th Cir. 2010) ("The fail-safe appellation is simply a way of labeling the obvious problems that exist when the class itself is defined in a way that precludes membership unless the liability of the defendant is established.").  Fail-safe classes put plaintiffs in a "heads I win, tails you lose" scenario that ties the class's scope to the case's outcome.  "Such a class is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those class members win or, by virtue of losing, they are not in the class and

are not bound." *Young v. Nationwide Mut. Ins.*, 693 F.3d 532, 538 (6th Cir. 2012) (cleaned up); *In re Nexium*, 777 F.3d at 22 n.19 (same).

For example, consider one case that Amex cites, *Pimentel v. City of Methuen*, No. CV 17-11921-FDS, 2019 WL 6699667 (D. Mass. Dec. 9, 2019). There, the plaintiff sought to certify a class consisting of "all Spanish-speaking Hispanic persons who have been arrested by the Methuen Police Department and prosecuted for OUI matters after receiving the unlawfully coercive Spanish advice of rights form." *Id.* at *3. The court observed that the class definition identified members by five objective elements: "whether (1) they speak Spanish, (2) identify as Hispanic, (3) were arrested by defendants, (4) received the form at issue, and (5) were then prosecuted for an OUI." *Id.* But the proposed class definition also included one improper element: it characterized the advice of rights form at issue as "unlawfully coercive." *Id.* Because that phrase, "unlawfully coercive," was a legal conclusion that affected the final disposition of the case—a class action alleging civil rights violations attributable to the form itself—the *Pimentel* court struck it. *Id.* To be in the class, a party had to have been "unlawfully" coerced by the form, but if the form was not "unlawfully coercive," the party was not in the class that litigated the case and thus not bound by an adverse judgment. In other words, the "unlawfully coercive" element was inappropriate precisely because it inextricably intertwined membership in the class with a successful claim on the merits. *Id.*

Or consider *Campbell v. First American Title Ins.*, 269 F.R.D. 68 (D. Me. 2010), which Amex incorrectly reads to establish a bright-line rule: eligibility as a class

26

member can never depend on a "legal conclusion." (ECF No. 25 at 15.) There, the court struck the phrase "qualified for the refinance rate because they have entered into an insured mortgage" from a proposed class definition. *Id.* at 73. But that was only because the plaintiffs sued precisely because they thought they "qualified for discounted refinance rates and did not receive those discounted rates," another obvious fail-safe problem. *Id.* at 70.

That is not the case here, though, because this class is not defined by "the terms of the legal injury" that the Merchants allege, violations of federal antitrust law. *In re Nexium*, 777 F.3d at 22. Instead, the class is defined by Amex's act that allowed the Merchants to get into court in the first place—its failure to pay arbitration fees. This class thus does not pose the fail-safe problem: allowing class members to "seek a remedy but not be bound by an adverse judgment—either those class members win or, by virtue of losing, they are not in the class and are not bound." *Young*, 693 F.3d at 538. Further, "the class description is sufficiently definite" that it is "administratively feasible" for this Court to figure out "whether a particular individual is a member." 4 Charles Alan Wright & Arthur R. Miller, 7A Fed. Prac. & Proc. Civ. § 1760 (4th ed. 2024). After all, the set is wholly defined by Amex's failure to pay fees in specific arbitrations, an objective and observable act. It is plausible that this class is ascertainable under Rule 23(a)—though the ultimate determination will come on a motion for class certification—so the Court will not strike the allegations on this ground.

### 2. Do the Merchants satisfy Rule 23(b)(2)?

Next, Amex argues that the Merchants cannot sustain a class under Rule 23(b)(2). (ECF No. 19 at 12–16.)  That rule has two requirements: (1) "the party opposing the class has acted or refused to act on grounds that apply generally to the class," and (2) "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Amex's arguments largely revolve around the second element.  It argues that because the Merchants each only sought individual injunctions at arbitration, any broader relief is clearly not needed and thus not "appropriate respecting the class as a whole."

Amex's position is internally incoherent and ultimately self-defeating.  Amex first argues that, because the Merchants "never sought" class-wide relief at the arbitrations, they cannot do so now as a matter of waiver.  (ECF No. 19 at 14.)  Yet in a footnote that follows, Amex acknowledges that "such relief [was] specifically prohibited by [the] arbitration agreement" to which the Merchants are subject. *Id.* at 14 n.5 (citing Amex Merchant Operating Guide § 13.1(c)).  Amex asks the Court to hold that the Merchants had to seek a plainly non-recoverable remedy at arbitration, in violation of the agreement, just to preserve a chance to litigate for that remedy. This makes no sense.

Next, Amex argues that "the very fact that each Claimant previously asserted an individual claim seeking an individual injunction applying to itself and its geographic competitors illustrates that 'complete relief' does not require an injunction 'respecting the class as a whole.'" (ECF No. 19 at 15) (internal quotations omitted).

28

But that runs up against the same problem described above: at arbitration, the Merchants likely could not have asserted anything but "an individual claim seeking an individual injunction," based on the Merchant Operating Guide.

In any event, Amex asks this Court to delve into a Goldilocks-style inquiry about the injunction: is it too broad (as Amex claims in its arguments about waiver), not broad enough (as Amex claims in its arguments about the meaning of "appropriate respecting the class as a whole"), or just right (as the Merchants contend)?  Today, the Court can put the waiver issue to rest.  But otherwise, answering that question would require the Court to preemptively decide issues that should arise on a motion for class certification.  When that motion comes, this Court will conduct "a rigorous analysis of the prerequisites established by Rule 23," including whether the relief requested is "appropriate respecting the class as a whole." *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).

But in the meantime, Amex has not shown "it is obvious from the pleadings that the proceeding cannot possibly move forward on a class-wide basis," and more importantly, that these issues are "distinct from the factors the court would consider on a motion for class certification." *Monteferrante v. Williams-Sonoma, Inc.*, 241 F. Supp. 3d 264, 269 (D. Mass. 2017); *Manning*, 725 F.3d at 59; *see also* Wright & Miller, 5C Fed. Prac. & Proc. Civ. § 1380 (3d. ed. 2024) ("Both because striking a portion of a pleading is a drastic remedy and because it often is sought by the movant simply as a dilatory or harassing tactic, numerous judicial decisions make it clear that motions under Rule 12(f) are viewed with disfavor by the federal courts and are infrequently

granted."); *Mazzola v. Roomster Corp.*, 948 F. Supp. 2d 395, 410 (S.D.N.Y. 2012) ("A motion to strike class allegations ... is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of ... litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification.") (cleaned up).

The Court thus declines to impose the "drastic remedy" of striking the allegations related to Rule 23(b)(2) so early in the litigation.

### 3. Can the Merchants plead a Rule 23(c)(4) class?

That leaves the Merchants' request for declaratory relief, a judicial statement "that American Express has violated Section One of the Sherman Act." (ECF No. 1 ¶ 73A.) The Merchants seek an issue-class judgment under Rule 23(c)(4), which provides that, "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." (ECF No. 1 ¶ 68). Amex claims that this "is a red herring, because Plaintiffs' declaratory relief class can only be certified if it satisfies Rule 23(b)(2)." (ECF No. 19 at 12 n.4.) And Amex posits that this declaratory relief does not "correspond to injunctive relief" and "serves the prohibited purpose of forming the basis for individual damages claims." (ECF No. 19 at 16.)

Amex is half-right. "Under the plain text of Rule 23, all certified classes must meet both the threshold requirements of Rule 23(a) and be maintainable under one of Rule 23(b)'s," so "there is no freestanding class to be certified under Rule 23(c)(4)." *Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 757–58 (D.C. Cir. 2023). So to

certify an issue class under Rule 23(c)(4), the Merchants will necessarily need to satisfy Rules 23(a) and 23(b).

But Amex errs in arguing that the Merchants are barred from seeking declaratory relief in pursuit of further damages under Rule 23(c)(4). The Complaint only cites Rule 23(b)(2), Amex observes, and it does so in reference to different relief, the injunction; that type of class action, Amex insists, cannot be used in furtherance of future damages claims.

It is true that in *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court made clear that Rule 23(b)(2) itself does "not authorize class certification when each class member would be entitled to an individualized award of monetary damages." 564 U.S. 338, 360–61 (2011). But that does not end the analysis. While Rule 23(b)(2) alone cannot be a basis for money damages, "a case may be certified under Rule 23(b)(2) for some purposes and under other portions of the Rule for money damages." *Newberg and Rubenstein on Class Actions* § 4:37 (6th ed. 2024). For instance, district courts have, post-*Dukes*, "bifurcated the action into two phases, certifying classes under both Rule 23(b)(2) and (b)(3)." *Ebert v. Gen. Mills, Inc.,* 823 F.3d 472, 480 (8th Cir. 2016). This "hybrid certification, insulating the (b)(2) class from the money-damage portion of the case, is an available approach that is gaining ground in class action suits." *Id.*; *see also Newberg and Rubenstein on Class Actions*, § 4:38 n.22 (6th ed. 2024) (collecting cases). And at least one other district court has, since *Dukes*, used Rule 23(c)(4) to bifurcate liability for a damages claim even involving a class

otherwise certified under Rule 23(b)(2). *See, e.g., Gulino v. Bd. of Educ.*, 907 F. Supp. 2d 492, 505–06 (S.D.N.Y. 2012).

When the D.C. Circuit said there is no "freestanding class to be certified under Rule 23(c)(4)," it meant the class must also "meet both the threshold requirements of Rule 23(a) and be maintainable under one of Rule 23(b)'s categories."  77 F.4th at 757–58.  And that leads right back to the question of bifurcation.  If the Merchants want to sustain a Rule 23(c)(4) issue class, they will need to show that they satisfy Rule 23(a) and be maintainable "under *one* of Rule 23(b)'s categories."  *Id.* at 757 (emphasis added).

But Amex is wrong to insist the Merchants are restricted to proving that issue class satisfies Rule 23(b)(2), just based on references to that rule in other parts of its Complaint.  They have made clear that they want to certify the issue class under Rule 23(c)(4), and that is enough to survive a motion to strike class allegations.  *Coll. of Dental Surgeons of P.R. v. Conn. Gen. Life Ins.*, 585 F.3d 33, 40 (1st Cir. 2009) ("A complaint that contains class-type allegations historically has been assumed to assert a class action before formal class certification."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (noting that "legal conclusions can provide the framework of a complaint").  After all, the First Circuit has cautioned, though in a slightly different context, that "reviewing the complaint alone is not normally a suitable method for determining whether a class eventually can be certified."  *Id.* at 41.

So, at class certification, the Merchants must show that the issue class satisfies Rule 23(a) and one of the three categories within Rule 23(b), and they must also prove

certification is "appropriate" under Rule 23(c)(4). *See, e.g.*, *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 262 (3d Cir. 2021) ("[W]hen a party seeks to certify 'particular issues' for class treatment, the district court must ask three questions. First, does the proposed issue class satisfy Rule 23(a)'s requirements? Second, does the proposed issue class fit within one of Rule 23(b)'s categories? Third, if it does, is it 'appropriate' to certify this as an issue class?") (cleaned up).

Should the Merchants try to certify a class under Rule 23(c)(4) using a Rule 23(b)(3) theory, they may also have to navigate a circuit split that the First Circuit has not yet addressed. As the Seventh Circuit recently put it, "[W]hen seeking certification of an issue class under Rule 23(c)(4) in a case requesting damages, must a party show that common issues predominate in the resolution of the entire claim, or is it enough that common issues predominate as to each issue to be certified?" *Jacks v. DirectSAT USA, LLC*, 118 F.4th 888, 896–97 (7th Cir. 2024) (first identifying that the Fifth Circuit has taken one position, that the Second, Third, Fourth, Sixth, and Ninth Circuits have taken another, and that the D.C. Circuit "staked out a middle ground," and then siding with the Second Circuit et al.).[6] But these are all questions for a later date.

All that is to say: Amex has not shown that the request for declaratory relief under Rule 23(c)(4) must—at this early point in the litigation—be taken off the table.

---

[6] It is unclear whether the Merchants need to address this issue. Technically, they seek a declaration of liability in furtherance of future, separate damages determinations, rather than directly "requesting damages." 118 F.4th at 896. The distinction seems thin, but if it renders the split irrelevant here, the Merchants will have to explain why.

*See Monteferrante*, 241 F. Supp. 3d at 269 (making clear that striking class pleadings is appropriate only when "it is obvious from the pleadings that the proceeding cannot possibly move forward on a class-wide basis," and if the issues are "distinct from the factors the court would consider on a motion for class certification"). The Court thus will not strike it from the Complaint.

## IV.    CONCLUSION

For these reasons, Amex's Motion to Compel Arbitration (ECF No. 18) and Motion to Strike Class Allegations (ECF No. 19) are DENIED.


IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge

December 2, 2024